Wayne BLAKE, Appellant,

v.

WOODFORD BANK AND TRUST COMPANY, Appellee.

WOODFORD BANK AND TRUST COMPANY, Cross-Appellant,

v.

Wayne BLAKE, Cross-Appellee.

Court of Appeals of Kentucky.

March 11, 1977.

Rehearing Denied June 3, 1977.

Discretionary Review Denied Oct. 3, 1977.

Tom H. Pierce and Victor Hellard, Jr., Rouse, Rouse & Hellard, Versailles, for appellant and cross-appellee.

W. Henry Graddy, IV and Gentry E. McCauley, Jr., McCauley & Elam, Versailles, for appellee and cross-appellant.

Before MARTIN, C. J., and PARK and VANCE, JJ.

PARK, Judge.

This case involves the liability of the appellee and cross-appellant, Woodford Bank and Trust Company, on two checks drawn on the Woodford Bank and Trust Company and payable to the order of the appellant and cross-appellee, Wayne Blake. Following a trial without a jury, the Woodford Circuit Court found that the bank was excused from meeting its "midnight deadline" with respect to the two checks. Blake appeals from the judgment of the circuit court dismissing his complaint. The bank cross-appeals from that portion of the circuit court's opinion relating to the extent of the bank's liability on the two checks if it should be determined that the bank was not excused from meeting its midnight deadline.

## BASIC FACTS

The basic facts are not in dispute. On December 6, 1973, Blake deposited a check in the amount of $16,449.84 to his account at the Morristown Bank, of Morristown, Ohio. This check was payable to Blake's order and was drawn on the K & K Farm

Account at the Woodford Bank and Trust Company. The check was dated December 3, 1973.

On December 19, 1973, Blake deposited a second check in the amount of $11,200.00 to his account in the Morristown Bank. The second check was also drawn on the K & K Farm Account at the Woodford Bank and Trust Company and made payable to Blake's order. The second check was dated December 17, 1973.

When Blake deposited the second check on December 19, he was informed by the Morristown Bank that the first check had been dishonored and returned because of insufficient funds. Blake instructed the Morristown Bank to re-present the first check along with the second check. Blake was a cattle trader, and the two checks represented the purchase price for cattle sold by Blake to James Knight who maintained the K & K Farm Account. Blake testified that he had been doing business with Knight for several years. On other occasions, checks had been returned for insufficient funds but had been paid when re-presented.

The two checks were forwarded for collection through the Cincinnati Branch of the Federal Reserve Bank of Cleveland. From the Federal Reserve Bank, the two checks were delivered to the Woodford Bank and Trust Company by means of the Purolator Courier Corp. The checks arrived at the Woodford Bank and Trust Company on Monday, December 24, 1973, shortly before the opening of the bank for business. The next day, Christmas, was not a banking day. The two checks were returned by the Woodford Bank and Trust Company to the Cincinnati Branch of the Federal Reserve

Bank by means of Purolator on Thursday, December 27, 1973.

The two checks were received by the bank on Monday, December 24. The next banking day was Wednesday, December 26. Thus, the bank's "midnight deadline" was midnight on Wednesday, December 26. KRS 355.4–104(1)(h).[1] As the bank retained the two checks beyond its midnight deadline, Blake asserts that the bank is "accountable" for the amount of the two checks under KRS 355.4–302(1)(a).[2]

## HISTORY OF PAYOR BANK'S LIABILITY FOR RETAINING CHECK

Under the Uniform Negotiable Instruments Law a payor bank was not liable to the holder of a check drawn on the bank until the bank had accepted or certified the check. *Ewing v. Citizens National Bank,* 162 Ky. 551, 172 S.W. 955 (1915); W. Britton, *Bills and Notes* § 169 (1943). Because of the payor bank's basic nonliability on a check, it was essential that some time limit be placed upon the right of the payor bank to dishonor a check when presented for payment. If a payor bank could hold a check indefinitely without incurring liability, the entire process of collection and payment of checks would be intolerably slow. To avoid this problem, a majority of courts construing § 136 and § 137 of the Uniform Negotiable Instruments Law held that a payor bank was deemed to have accepted a check if it held the check for 24 hours after the check was presented for payment. Britton, *op.cit.* § 179. Thus, in a majority of jurisdictions, the payor bank had only 24 hours to determine whether to pay a check or return it. However, in Kentucky and a

1. KRS 355.4–104(1)(h) provides:
   " 'Midnight deadline' with respect to a bank is midnight on its next banking day following the banking day on which it receives the relevant item or notice or from which the time for taking action commences to run, whichever is later."

2. KRS 355.4–302(1) provides:
   "In the absence of a valid defense such as breach of a presentment warranty (subsection (1) of KRS 355.4–207), settlement effected or the like, if an item is presented on and received by a payor bank the bank is accountable for the amount of (a) a demand item other than a documentary draft whether properly payable or not if the bank, in any case where it is not also the depository bank, retains the item beyond midnight of the banking day of receipt without settling for it or, regardless of whether it is also the depository bank, does not pay or return the item or send notice of dishonor until after its midnight deadline."

few other jurisdictions, the courts held that § 136 and § 137 of the Uniform Negotiable Instruments Law applied only to checks which were presented for acceptance. In *Kentucky Title Savings Bank and Trust Company v. Dunavan,* 205 Ky. 801, 266 S.W. 667 (1924), the Court of Appeals held that § 136 and § 137 of the Uniform Negotiable Instruments Law had no application to a check which was presented for payment. Consequently, the payor bank would be liable on the check only if it held the check "for an unreasonable length of time" and could thus be deemed to have converted the check.

In order to bring uniformity to the check collection process, the Bank Collection Code was proposed by the American Bankers' Association. The Bank Collection Code was adopted by Kentucky in 1930. Under § 3 of the Bank Collection Code, a payor bank could give provisional credit when a check was received, and the credit could be revoked at any time before the end of that business day. The payor bank became liable on the check if it retained the item beyond the end of the business day received. 1930 Kentucky Acts, ch. 13, § 3 (former KRS 357.030).

Banks had only a few hours to determine whether a check should be returned because of insufficient funds. Banks were required to "dribble post checks" by sorting and sending the checks to the appropriate bookkeepers as the checks were received. This led to an uneven workload during the course of a business day. At times, the bookkeeping personnel might have nothing to do while at other times they would be required to process a very large number of checks in a very short time. H. Bailey, *The Law of Bank Checks (Brady on Bank Checks)* § 10.4 (4th ed. 1969). Because of the increasingly large number of checks processed each day and the shortage of qualified bank personnel during World War II, it became impossible for banks to determine whether a check was "good" in only 24 hours. The banks were forced to resort to the procedure of "paying" for a check on the day it was presented without posting it to the customer's account until the following day. See *First National Bank of Elwood v. Universal C.I.T. Credit Corporation,* 132 Ind.App. 353, 170 N.E.2d 238, at 244 (1960). To meet this situation, the American Banking Association proposed a Model Deferred Posting Statute. The Model Deferred Posting Statute was not adopted in Kentucky until 1956. 1956 Kentucky Acts, ch. 47 (former KRS 357.125).

Under the Model Deferred Posting Statute, a payor bank could give provisional credit for a check on the business day it was received, and the credit could be revoked at any time before midnight of the bank's next business day following receipt. A provisional credit was revoked "by returning the item, or if the item is held for protest or at the time is lost or is not in the possession of the bank, by giving written notice of dishonor, nonpayment, or revocation; provided that such item or notice is dispatched in the mails or by other expeditious means not later than midnight of the bank's next business day after the item was received." 1956 Kentucky Acts, ch. 47, § 1(1) (former KRS 357.125). If the payor bank failed to take advantage of the provisions of the deferred posting statute by revoking the provisional credit and returning the check within the time and in the manner provided by the act, the payor bank was deemed to have paid the check and was liable thereon to the holder. *First National Bank of Elwood v. Universal C.I.T. Credit Corporation, supra.*

The Model Deferred Posting Statute was the basis for the provisions of the Uniform Commercial Code. Under § 4–301(1) of the Uniform Commercial Code (UCC) [3], a payor bank may revoke a provisional "settlement"

---

3. KRS 355.4–301(1) provides:

"Where an authorized settlement for a demand item (other than a documentary draft) has been made before midnight of the banking day of receipt the payor bank may revoke the settlement and recover any payment if before it has made final payment (subsection (1) of KRS 355.4–213) and before its midnight deadline it (a) returns the item; or (b) sends written notice of dishonor or nonpayment if the item is held for protest or is otherwise unavailable for return."

if it does so before its "midnight deadline" which is midnight of the next banking day following the banking day on which it received the check. Under the Model Deferred Posting Statute, the payor bank's liability for failing to meet its midnight deadline was to be inferred rather than being spelled out in the statute. Under UCC § 4–302, the payor bank's liability for missing its midnight deadline is explicit. If the payor bank misses its midnight deadline, the bank is "accountable" for the face amount of the check. See *Farmers Cooperative Livestock Market v. Second National Bank*, Ky., 427 S.W.2d 247 (1968).

Like the Model Deferred Posting Statute, the Uniform Commercial Code seeks to decrease, rather than increase, the risk of liability to payor banks. By permitting deferred posting, the Uniform Commercial Code extends the time within which a payor bank must determine whether it will pay a check drawn on the bank. Unlike the Bank Collection Code or the Uniform Negotiable Instruments Law as construed by most courts, the Uniform Commercial Code does not require the payor bank to act on the day of receipt or within 24 hours of receipt of a check. The payor bank is granted until midnight of the next business day following the business day on which it received the check.

### EXCUSE FOR FAILING TO MEET MIDNIGHT DEADLINE

UCC § 4–108(2) [KRS 355.4–108(2)] provides:

"Delay by a * * * payor bank beyond time limits prescribed or permitted by this Act * * * is excused if caused by interruption of communications facilities, suspension of payments by another bank, war, emergency conditions or other circumstances beyond the control of the bank provided it exercises such diligence as the circumstances require."

The circuit court found that the bank's failure to return the two checks by its midnight deadline was excused under the provisions of UCC § 4–108.

The circuit court dictated its findings of fact into the record:

"From all of the evidence that was presented in this case, it would appear that there was no intentional action on the part of the bank to hold these checks beyond the normal course of business as an accommodation to its customer. In fact, the uncontroverted testimony of the bank officers was to the contrary. To say that the bank failed, through certain procedures, to return the checks by the midnight deadline does not, in the mind of this Court, imply or establish an intentional act on the part of the bank.

\* \* \* \* \* \*

"In this instance we have the Christmas Holiday, which caused in the bank, as in all businesses, certain emergency and overloaded situations. This is not unique to the banking industry; but is true of virtually every business in a christian society, in which the holiday of Christmas is observed as the major holiday of the year. Special considerations are always given to employees as well as customers of these banking institutions.

" * * * On the Christmas Holiday, two machines were broken down for periods of time during this critical day in question. There was an absence of a regular bookkeeper."

Under CR 52.01, these findings of fact cannot be set aside by this court unless they are clearly erroneous. The foregoing findings are supported by the record, and are not questioned by Blake on the appeal.

After making findings of fact, the circuit court dictated the following conclusions into the record:

" * * * The entire cumulative effect of what happened would constitute diligence on the part of the bank, as circumstances required.

"It is the opinion of the Court and it is the Finding of the Court that the circumstances described by the banking officers, the standards of banking care, as described by expert witnesses, would bring the bank within 4–108(2), and the Court therefore, finds as a fact that there were

circumstances here beyond the control of the bank, and that it exercised such diligence as those circumstances required."

When the circuit court concluded "that there were circumstances here beyond the control of the bank, and that it exercised such diligence as those circumstances required," the circuit court was doing no more than repeating the words of the statute. This court must determine whether the circuit court's findings of fact support these conclusions.

Before turning to the facts presented in this case, it is appropriate to discuss the only two cases involving the application of UCC § 4–108 to a payor bank's midnight deadline. In *Sun River Cattle Co. v. Miners Bank of Montana,* 164 Mont. 237, 521 P.2d 679, 14 UCC Rep. 1004 (1974), the payor bank utilized a computer in the adjacent town of Great Falls to process its checks. The checks were picked up at the Miners Bank by an armored car between 5:00 p. m. and 6:00 p. m. on the date of receipt. The checks would normally reach the computer center at Great Falls around 10:30 p. m. Ordinarily the checks would have been processed by 11:30 p. m., returned to the Miners Bank by 8:00 a. m. the next morning. The checks in question were received by the Miners Bank on May 11. On that day, the armored car broke down, and the checks did not reach the computer center at Great Falls until 1:30 a. m. the next morning, May 12. On that morning, the computer malfunctioned and the checks were not returned to the Miners Bank until 2:30 p. m. on May 12. There was no testimony as to what actually happened to the checks after they were received by the Miners Bank on the afternoon of May 12, but the Miners Bank failed to return the checks by midnight of May 12. The trial court held that the failure of the Miners Bank to meet its midnight deadline was excused by the provisions of UCC § 4–108(2). The Montana Supreme Court reversed, holding that the Miners Bank had failed to show the degree of diligence required under the circumstances. The Montana court pointed out that the Miners Bank had more than the normal interest in the activities in the account upon which the checks were drawn, and that due diligence could not be shown merely by following ordinary operating procedures.

In *Port City State Bank v. American National Bank,* 486 F.2d 196, 13 UCC Rep. 423 (10th Cir. 1973), the payor bank, American National, was changing from machine posting to computer processing of its checks commencing Monday, December 1, 1969. Two checks were in dispute. The first check arrived at American National on Friday, November 28, 1969. As Monday was the next banking day, the midnight deadline for the first check was December 1. The second check arrived on Tuesday, December 2, 1969, and the midnight deadline for that check was Wednesday, December 3. American National's new computer developed a "memory error" which rendered it unusable at 10:00 a. m. on December 1, the first day of computer operations. The computer manufacturer assured the bank that repairs would not take "too long." Unfortunately repairs and testing were not completed until the early hours of Tuesday, December 2. In the meantime, American National attempted to utilize an identical computer in a bank some two and a half hours away. Processing commenced at the other bank at 11:30 p. m. on December 1, and continued through the night. Although work proceeded to the point of "capturing" all of the items on discs, the backup computer was required by its owner, and the American National personnel returned to the bank to complete the printing of the trial balances. Another memory error developed in the new computer which again rendered the computer unusable. No further use could be made of American National's computer until a new memory module was installed on Thursday, December 4. The trial court held that the computer breakdown constituted a condition beyond the control of American National and that the bank had exercised due diligence. On appeal, the United States Court of Appeals affirmed, holding that the findings of the district court were not clearly erroneous.

There are no Kentucky cases construing § 4–108(2). However, there is one Kentucky case construing similar language in a contract. In *American Bridge Co. v. Glenmore Distilleries Company*, 32 Ky.L.Rptr. 873, 107 S.W. 279 (1908), the American Bridge Company contracted to construct a steel tower for Glenmore Distilleries in a period of 45 working days. The contract provided that American Bridge "shall not be held responsible for delays in transportation, strikes, fires, floods, storms, nor for any other circumstances beyond its reasonable control." American Bridge attempted to excuse its failure to complete the tower within 45 working days on the grounds that it was not possible to obtain the steel necessary to erect the tower. The Kentucky Court of Appeals held that American Bridge was not excused for the delay in completing the tower, stating:

"Under the familiar rule of ejusdem generis, the general language following the specific enunciation of the causes which prevented the appellant from being responsible for nonperformance of its contract within the stipulated time must be limited to include causes similar to those specifically set out; and, under this rule, we think it clear that the failure of the appellant to provide material with which to carry into effect its contract was not a circumstance beyond its reasonable control. None of the specified causes for nonresponsibility could possibly be controlled by any foresight on the part of the appellant; but foresight would undoubtedly suggest before making a contract so urgent in its nature as the one before us, that the material with which it was to be carried into effect should have been secured in advance, at least, foresight and diligence would have secured the material in advance, and therefore the failure to exercise these cannot be said to be a cause for nonfulfillment beyond the reasonable control of the appellant." 107 S.W. at 283

The facts of this case will be examined in light of the principles set out in the foregoing cases.

The basic facts found by the circuit court can be summarized as follows: a) the bank had no intention of holding the checks beyond the midnight deadline in order to accommodate its customer; b) there was an increased volume of checks to be handled by reason of the Christmas Holiday; c) two posting machines were broken down for a period of time on December 26; d) one regular bookkeeper was absent because of illness. Standing alone, the bank's intention not to favor its customer by retaining an item beyond the midnight deadline would not justify the application of § 4–108(2). The application of the exemption statute necessarily will turn upon the findings relating to heavy volume, machine breakdown, and absence of a bookkeeper.

The bank's president testified that 4,200 to 4,600 checks were processed on a normal day. Because the bank was closed for Christmas on Tuesday, the bank was required to process 6,995 checks on December 26. The bank had four posting machines. On the morning of December 26, two of the machines were temporarily inoperable. One of the machines required two and one half hours to repair. The second machine was repaired in one and one half hours. As the bank had four bookkeepers, the machine breakdown required the bookkeepers to take turns using the posting machines for a time in the morning. One of the four bookkeepers who regularly operated the posting machines was absent because of illness on December 26. This bookkeeper was replaced by the head bookkeeper who had experience on the posting machines, although he was not as proficient as a regular posting machine operator.

Because of the cumulative effect of the heavy volume, machine breakdown and absence of a regular bookkeeper, the bank claims it was unable to process the two checks in time to deliver them to the courier from Purolator for return to the Federal Reserve Bank on December 26. As the bank's president testified:

"Because we couldn't get them ready for the Purolator carrier to pick them up by 4:00 and we tried to get all our work

down there to him by 4:00, for him to pick up and these two checks were still being processed in our bookkeeping department and it was impossible for those to get into returns for that day."

The validity of this claim must be considered in light of the testimony of the bank's bookkeeper who processed the two checks.

Betty Stratton was the regular bookkeeper who posted all of the accounts from "D" through "K", and she processed the two checks in question on December 26. While two posting machines were being repaired, Mrs. Stratton shared her posting machine with Garnetta Bunch, another regular bookkeeper and posting machine operator. Since the substitute bookkeeper was not processing the two checks in question and was not sharing a posting machine with Mrs. Stratton, it is difficult to see how the absence of one of the regular bookkeepers could have delayed the posting of the two checks in question.

Mrs. Stratton testified that she did not complete the posting of all of the checks in the "H" through "K" accounts until after 4:00. Had it not been for the extra volume of checks to be handled and the breakdown in the posting machines, she should have completed the process of posting by 12:30 p.m. In accordance with her operating instructions, Mrs. Stratton took the two checks to Susan Williams, the bank employee with the duty of handling any checks which were to be returned because of insufficient funds. Because of the lateness of the hour, Ms. Williams and all responsible officers of the bank had left for the day. Mrs. Stratton left the two checks on Ms. Williams desk. Mrs. Stratton testified on cross-examination:

"X50 And Ms. Williams was not there?

A. No.

X51 Did you make any effort, Mrs. Stratton to find anybody to give the check to?

A. No.

X52 Were you aware that if that check was not returned timely that the bank might be subject to some liability?

A. No, sir."

The two checks were returned to the Cincinnati branch of the Federal Reserve Bank by the regular Purolator courier on Thursday afternoon, December 27.

The increased volume of items to be processed the day after Christmas was clearly foreseeable. The breakdown of the posting machines was not an unusual occurrence, although it was unusual to have two machines broken down at the same time. In any event, it should have been foreseeable to the responsible officers of the bank that the bookkeepers would be delayed in completing posting of the checks on December 26. Nevertheless, the undisputed evidence establishes that no arrangements of any kind were made for return of "bad" items which might be discovered by the bookkeepers after the departure of the Purolator courier. The two checks in question were in fact determined by Mrs. Stratton to be "bad" on December 26. The checks were not returned because the regular employee responsible for handling "bad" checks had left for the day, and Mrs. Stratton had no instructions to cover the situation.

Even though the bank missed returning the two checks by the Purolator courier, it was still possible for the bank to have returned the checks by its midnight deadline. Under UCC § 4–301(4)(b) [4] an item is returned when it is "sent" to the bank's transferor, in this case the Federal Reserve Bank. Under UCC § 1–201(38) [5] an item is

---

4. KRS 355.4–301(4)(b) provides:
   "An item is returned in all other cases, when it is sent or delivered to the bank's customer or transferor or pursuant to his instructions."

5. KRS 355.1–201(38) provides:
   " 'Send' in connection with any writing or notice means to deposit in the mail or deliver for transmission by any other usual means of communication with postage or cost of transmission provided for and properly addressed and in the case of an instrument to an address specified thereon or otherwise agreed, or if there be none to any address reasonable under the circumstances. The receipt of any writing or notice within the time at which it would have arrived if properly sent has the effect of a proper sending."

"sent" when it is deposited in the mail. 1 R. Anderson, *Uniform Commercial Code* § 1–201 pp. 118–119 (2d ed. 1970). Thus, the bank could have returned the two checks before the midnight deadline by the simple procedure of depositing the two checks in the mail, properly addressed to the Cincinnati branch of the Federal Reserve Bank.

■ This court concludes that circumstances beyond the control of the bank did not prevent it from returning the two checks in question before its midnight deadline on December 26. The circumstances causing delay in the bookkeeping department were foreseeable. On December 26, the bank actually discovered that the checks were "bad," but the responsible employees and officers had left the bank without leaving any instructions to the bookkeepers. The circuit court erred in holding that the bank was excused under § 4–108 from meeting its midnight deadline. The facts found by the circuit court do not support its conclusion that the circumstances in the case were beyond the control of the bank.

### RE–PRESENTMENT OF CHECK PREVIOUSLY DISHONORED BY NONPAYMENT

On its cross-appeal, the bank argues that the circuit court erred in holding that there was no difference in the status of the two checks. The bank makes the argument that it is not liable on the first check which had previously been dishonored by nonpayment. Blake received notice of dishonor when the first check was returned because of insufficient funds. The bank claims that it was under no further duty to meet the midnight deadline when the check was re-presented for payment.

The bank relies upon the decision of the Kansas Supreme Court in *Leaderbrand v. Central State Bank,* 202 Kan. 450, 450 P.2d 1, 6 UCC Rep. 172 (1969). A check drawn on the Central State Bank was presented

for payment on two occasions over the counter. On both occasions, the holder of the check was advised orally that there were not sufficient funds in the account to honor the check. Later, the holder deposited the check in his own account at the First State Bank. The First State Bank did not send the check through regular bank collection channels, but rather mailed the check directly to the Central State Bank for purposes of collection. The check arrived at the Central State Bank on March 21 or March 22, and the check was not returned by the Central State Bank to the First State Bank until April 5. The Kansas Supreme Court held that there was no liability under § 4–302 of UCC for a check which had previously been dishonored when presented for payment.

Relying on the provisions of UCC § 3–511(4) [6], the Kansas Supreme Court held that "any notice of dishonor" was excused when a check had been "dishonored by nonacceptance" and was later re-presented for payment. The Kansas Supreme Court specifically held that § 3–511(4) applied to a check which was dishonored when presented for payment, stating:

> "While the language of 84–3–511(4), supra—'Where a draft has been dishonored by nonacceptance'—does not refer to a dishonor by nonpayment, we think reference to the dishonor of a 'draft' 'by nonacceptance' would, a fortiori, include the dishonor of a check by nonpayment."

The Kansas Supreme Court concluded that a payor bank was excused from giving any further notice of dishonor when a previously dishonored check was re-presented for payment and there were still insufficient funds in the drawer's account to cover the check.

The decision in the *Leaderbrand* case was approved in *Goodman v. Norman Bank of Commerce,* Okl.App., 551 P.2d 661, 19 UCC Rep. 638 (1976). The Oklahoma Court of Appeals held that a payor bank was not

---

6. KRS 355.3–511(4) provides:

"Where a draft has been dishonored by nonacceptance a later presentment for payment and any notice of dishonor and protest for nonpayment are excused unless in the meantime the instrument has been accepted."

required to send an additional notice of dishonor before its midnight deadline when a previously dishonored check was re-presented for payment and there were still insufficient funds in the account to pay the check.

The decision of the Kansas Supreme Court in the *Leaderbrand* case has been criticized. As UCC § 3–511(4) applies by its terms to a "draft" which has been "dishonored by nonacceptance," most of the criticism has been directed to the Kansas court's application of § 3–511(4) to a check which had been dishonored by nonpayment. As stated in B. Clark and A. Squillante, *The Law of Bank Deposits, Collections and Credit Cards* at 71–72 (1970):

> "Use of this section to excuse retention under § 4–302 seems questionable, since the draftsmen are saying nothing more than dishonor by nonacceptance excuses notice of dishonor by nonpayment. If a time draft is not accepted, it is a useless act to present it for payment. On the other hand, sending a check through a second or third time often yields results, since the depositor may have had time to make a deposit to his account. It is presumably for this reason that the Code draftsmen limited the excuse rule of § 3–511(4) to 'nonacceptance' of 'drafts' and did not by express language indicate 'nonpayment' of 'checks.' "

See also Note, Uniform Commercial Code—Nonapplicability of Payor Banks "Midnight Deadline" to Re-Presented Checks, 18 *Kan. L.Rev.* 679 (1970).

Two courts have refused to follow the *Leaderbrand* decision. In *Wiley, Tate and Irby v. Peoples Bank and Trust Company*, 438 F.2d 513; 8 UCC Rep. 887 (5th Cir. 1971), the United States Court of Appeals for the Fifth Circuit held:

> "We disagree with *Leaderbrand* and hold § 3–511(4) inapplicable here. Acceptance applies only to time items. It has nothing to do with demand items."

In *Sun River Cattle Co. v. Miners Bank of Montana, supra,* the Montana Supreme Court rejected the *Leaderbrand* decision and followed the decision of the United States Court of Appeals in the *Wiley, Tate and Irby* case. The Montana Supreme Court held that § 3–511(4) of the UCC was inapplicable to checks payable on demand.

The decisions in the *Wiley, Tate and Irby* and *Sun River Cattle Co.* cases are consistent with the opinion of the Court of Appeals in *Kentucky Title Savings Bank and Trust Co. v. Dunavan, supra,* construing § 136 and § 137 of the Negotiable Instruments Law. As mentioned earlier in this opinion, the Court of Appeals held that statutory provisions relating to presentment for acceptance did not apply to presentment for payment. Thus, there are ample grounds for rejecting the *Leaderbrand* opinion based upon the technical language of UCC § 3–511(4). However, there are more fundamental reasons why the *Leaderbrand* decision is unsound and should not be followed in Kentucky.

The *Leaderbrand* decision is based upon the assumption that the sanctions of § 4–302 are applied to a failure to give timely notice of dishonor. This assumption may appear reasonable from an initial reading of UCC § 4–302(1)(a). Under that section, a payor bank is accountable for a check if it "does not pay or return the item or send notice of dishonor until after its midnight deadline." If a payor bank were excused from giving notice of dishonor, it would be plausible to argue that it was not accountable under § 4–302. However, this reasoning ignores the primary purpose of notice of dishonor, and it completely ignores the language of UCC § 4–301.

■ Prior to the time that he received the first check, Blake had a contractual claim for the purchase price of the cattle. When Blake took the first check, his claim for the purchase price of the cattle was not discharged, but that claim was "suspended pro tanto" until Blake presented the check for payment. See UCC § 3–802(1)(b) [7].

---

7. KRS 355.3–802(1)(b) provides:
  "Unless otherwise agreed where an instrument is taken for an underlying obligation

\* \* \* the obligation is suspended pro tanto until the instrument is due or if it is payable on demand until its presentment. If the

Furthermore, at the moment he took the check, Blake had no claim against Knight on the check itself. As drawer of the check, Knight was a "secondary party." UCC § 3–102(1)(d) [8]. As a secondary party, Knight was not liable on the first check until Blake had presented the check for payment and notice of dishonor had been given. See UCC § 3–501(1)(c) and (2)(b) [9]. The first check was dishonored when it was returned in a timely manner for insufficient funds. See UCC § 3–507(1)(a) [10]. As soon as the first check was dishonored, Blake had a right to maintain an action on the check itself or on the underlying contract for the cattle. See UCC § 3–802(1)(b); Clark and Squillante, op.cit., at 17. When Blake re-presented the check for payment, there was no need for a further notice of dishonor in order to revive the underlying contract or to make Knight liable on the check.

Even if it was unnecessary to give further notice of dishonor when the check was re-presented for payment in order to make Knight liable on the check and to revive the underlying contract, it does not follow that the bank was relieved of its obligation to meet the midnight deadline. Most opinions and commentaries have focused on UCC § 4–302 which only defines the extent of the payor bank's liability for failure to meet its midnight deadline. Whether a payor bank has met its midnight deadline for return of an item is determined by UCC § 4–301, not § 4–302. Under § 4–301(1), a payor bank may "revoke" a provisional settlement if, before its midnight deadline, the payor bank complies with the following requirements:

"(a) returns the item; or

(b) sends written notice of dishonor or nonpayment if the item is held for protest or is otherwise unavailable for return."

Written notice of dishonor is a permitted method of revoking a provisional settlement *only* if the check is unavailable for return or it is being held for protest. Otherwise, the check itself must be returned.

The relationship of UCC § 4–301 and § 4–302 was clearly demonstrated by the unusual facts presented in *United States v. Loskocinski*, 403 F.Supp. 75, 18 UCC Rep. 461 (E.D.N.Y.1975). In the course of an armed robbery of the National Bank of North America, eleven blank cashier's checks were stolen. After forging the bank officer's signature and completing the check in the approximate sum of $99,000.00, one of the stolen checks was presented for payment to the bank by a distant bank to which it had been negotiated. The payor bank dishonored and returned this check by its midnight deadline. In the course of investigating the armed robbery, a grand jury subpoena duces tecum was served upon the bank directing it to turn over any other stolen checks which might be presented. The bank moved to quash the subpoena on the grounds that its failure to return the checks as required by UCC § 4–301 would expose it to staggering liability under UCC § 4–302. In support of the subpoena, the government argued that the bank could avoid liability under § 4–302 by giving written notice of dishonor rather than returning the checks themselves. The United States District Court for the Eastern District of New York granted the bank's motion to quash the subpoena. The district court held

instrument is dishonored action may be maintained on either the instrument or the obligation; discharge of the underlying obligor on the instrument also discharges him on the obligation."

**8.** KRS 355.3–102(1)(d) provides:
"'Secondary party' means a drawer or indorser."

**9.** KRS 355.3–501 provides in part:
"(1) Unless excused (KRS 355.3–511) presentment is necessary to charge second-

ary parties as follows: * * * in the case of any drawer, * * * presentment for payment is necessary * * *. (2) Unless excused * * * in the case of any drawer * * * notice of any dishonor is necessary * * *."

**10.** KRS 355.3–507(1)(a) provides in part:
"An instrument is dishonored when * * * in case of bank collections the instrument is seasonably returned by the midnight deadline."

that the bank was under a duty to return the checks themselves unless the checks were being held for protest or were "otherwise unavailable for return." Because of the district court's doubt whether, as a matter of New York state law, the subpoena would make the checks "otherwise unavailable for return," the court held that the bank could refuse to honor the subpoena so that the checks themselves could be returned.

In the present case, both checks were available to the bank for return. Neither check was being held for protest. Consequently, the only way the bank could revoke its provisional settlement for the check was by returning the check before its midnight deadline. As notice of dishonor was not available as a means of revoking the provisional settlement, the provisions of § 3–511(4) excusing notice of dishonor could have no application to the case.

A practical reason also exists for rejecting the *Leaderbrand* decision. In 1972, approximately 25 billion checks passed through the bank collection process. The Federal Reserve Banks handled 8 billion checks that year. *Community Bank v. Federal Reserve Bank of San Francisco*, 500 F.2d 282, (9th Cir. 1974) *modified*, 525 F.2d 690 (9th Cir. 1975), *cert. denied* 419 U.S. 1089, 95 S.Ct. 680, 42 L.Ed.2d 681[11]. An earlier study indicated that only one half of one percent of all checks were dishonored when first presented for payment. Of those initially dishonored, approximately one half were paid upon re-presentment. F. Leary, Check Handling Under Article Four of the Uniform Commercial Code, 49 *Marq.L.Rev.* 331, 333, n. 7 (1965). A significant number of previously dishonored checks are paid upon re-presentment in the regular course of the check collection process. Such checks are often presented through intermediate collecting banks, such as the Federal Reserve Bank in this case. Each collecting bank will have made a provisional settlement with its transferor, and, in turn, received a provisional settlement from the bank to which it forwarded the check. In this way, a series of provisional settlements are made as the check proceeds through the bank collection process.

Under UCC § 4–213(2)[12], final payment of a check "firms up" all of the provisional settlements made in the collection process. Under subsection (1)(d) of UCC § 4–213, a payor bank makes final payment of a check when it fails to revoke a provisional settlement "in the time and manner permitted by statute, clearing house rule or agreement." As to items not presented over the counter or by local clearing house, this means that a payor bank is deemed to have made final payment of a check when it fails to revoke a provisional settlement by its midnight deadline. See UCC § 4–213, Official Code Comment 6. In his article on check handling, Leary has described § 4–213 as the "zinger" section: "when provisional credit given by the payor bank becomes firm then

11. In this case, the United States Court of Appeals held that any bank, which utilized the check collection facilities of the Federal Reserve System by magnetic encoding its checks, becomes subject to Regulation J of the Board of Governors dealing with check collections. See also § 4–103(2) of the UCC (KRS 355.4–103(2)) and Comment 3 of the Official Code Comment. Although the parties have argued whether the bank has violated any of the provisions of Regulation J, this Court concludes that Regulation J imposed no additional duty on the bank relevant to *this* case.

12. KRS 355.4–213 provides in part:
"(1) An item is finally paid by a payor bank when the bank has done any of the following, whichever happens first:
* * * * * *

(d) made a provision settlement for the item and failed to revoke the settlement in the time and manner permitted by statute, clearing house rule or agreement.

Upon a final payment under paragraphs (b), (c) or (d) the payor bank shall be accountable for the amount of the item.

(2) If provisional settlement for an item between the presenting and payor banks is made through a clearing house or by debits or credits in an account between them, then to the extent that provisional debits or credits for the item are entered in accounts between the presenting and payor banks or between the presenting and successive prior collecting banks seriatim, they become final upon final payment of the item by the payor bank."

—'zing'—all prior provisional credits are instantaneously made firm." Leary, op.cit., at 361. If a payor bank was not required to meet its midnight deadline with respect to previously dishonored items, then none of the other banks involved in the collection process could safely assume that the check had been paid. Consider the problems of the depository bank. It must permit its customer to withdraw the amount of the credit given for the check when provisional settlements have become final by payment and the bank has had "a reasonable time" to learn that the settlement is final. See UCC § 4–213(4)(a). The depository bank will rarely receive notice that an item has been paid. In actual practice, the depository bank will utilize availability schedules to compute when it should receive the check if it is to be returned unpaid. Leary, op.cit., at 345–346. If a payor bank is not bound by its midnight deadline as to previously dishonored items, then there is no way for the depository bank to know whether a previously dishonored item has been paid upon re-presentment except by direct communication with the payor bank. Such a procedure would impose an unnecessary burden upon the check collection process.

This court concludes that the circuit court was correct in holding that there was no difference in the status of the two checks.

## MEASURE OF LIABILITY

The bank contends that its liability should be determined under subsection (5) of UCC § 4–103. The general measure of damages for failure to exercise ordinary care in handling a check in the collection process is the face amount of the check less any sum which could not have been realized even by the exercise of ordinary care. As there was never more than $1,853.32 in the K & K Farm Account at any time after December 11, 1973, the bank claims that Blake can show no actual damage resulting from the one day delay in returning the two checks. This argument ignores the fact that a payor bank is liable for the face amount of the check under UCC § 4–302 when it delays returning a check beyond its midnight deadline. *Farmers Cooperative Livestock Market v. Second National Bank, supra; Rock Island Auction Sales v. Empire Packing Company*, 32 Ill.2d 269, 204 N.E.2d 721, 18 A.L.R.3d 1368 (1965). The bank's liability for the face amount of the check is not based upon its failure to exercise ordinary care. By delaying return of the check beyond its midnight deadline, the bank is deemed to have paid the check. Having paid the check, it is therefore accountable for the face amount of the check. See UCC § 4–213(1). Damages have no relevance to the concept of accountability.

There is a rational basis for imposing a different liability on payor banks than is imposed upon collecting banks. The payor bank is the only bank in the collection process in a position to know the actual state of the drawer's account, and it is the only bank in the collection process that can actually pay the check.

Deferred posting was authorized by the Bank Collection Article of the Uniform Commercial Code, and by its predecessor, the Model Deferred Posting Statute, in order to grant payor banks additional time within which to determine whether to pay a check presented for collection. If banks are no longer able to meet their midnight deadline because of new banking conditions, then the remedy of the banks is to be found in the legislature. The present statute is intended to provide a mechanical standard of easy application for determining the time of payment of checks and the liability of payor banks. Having in mind the need for prompt settlement of items in the collection process, this court is not at liberty to tinker with the present statute by judicial amendment.

When a payor bank has paid a check by failing to return the check by its midnight deadline, the bank may be entitled to relief under UCC § 3–418. Under the statute, payment of a check is final only in favor of a holder in due course or a person who has in good faith changed his position in reliance on the payment. As explained in the official comment:

"If no value has been given for the instrument the holder loses nothing by the recovery of the payment \* \* \* and is not entitled to profit at the expense of the drawee; \* \* \* If he has taken the instrument in bad faith or with notice he has no equities as against the drawee." Comment 3, Official Code Comment, UCC § 3–418.

In their commentary on UCC § 3–418, Clark and Squillante state:

"For example, if a drawee bank pays a check and then realizes that the drawer has insufficient funds in his account, that mistake is irreversible as against a holder in due course or a person who has relied on the payment. Does this mean that payment by mistake is final in favor of the original payee of a check who deposited it for collection and did not negotiate it to a holder in due course? The Code provides that the payee may himself be a holder in due course. § 3–302(2). Therefore, if the payee gave value for the check and was without notice of any defense which might have been asserted by the drawer, the drawee bank is stuck. Conversely, if the payee is not a holder in due course, payment might be reversed since the payee could probably not show that he 'has in good faith changed his position in reliance on the payment.'" *op.cit.* at 218.

Neither party relies upon § 3–418, and there is no evidence in the record that Blake was not a holder in due course at the time he took the checks from Knight.

The bank also contends that UCC § 4–302 is unconstitutional because of the different liability imposed upon payor banks and collecting banks. The record establishes that the attorney general was not notified that the constitutionality of the statute was being questioned. CR 24.03; KRS 418.075. Therefore, this court will not consider the issue. *Dewey v. Allinder*, Ky., 469 S.W.2d 548 (1971).

## CONCLUSION

The judgment of the circuit court on the appeal is reversed with directions to enter judgment in favor of Blake for the face amount of the two checks, less a credit for any amounts which Blake may have recovered from Knight. The judgment on the cross-appeal is affirmed.

All concur.