624 P.2d 227 (1981)
FIRST WYOMING BANK, N.A. Sheridan, a Wyoming Corporation, Appellant (Defendant),
v.
CABINET CRAFT DISTRIBUTORS, INC., a Montana Corporation, Appellee (Plaintiff).
No. 5366.
Supreme Court of Wyoming.
February 18, 1981.
Michael K. Shoumaker, Badley, Rasmussen & Shoumaker, Sheridan, for appellant.
Kim D. Cannon, Burgess & Davis, Sheridan, for appellee.
Before ROSE, C.J.,[*] and McCLINTOCK, RAPER,[**] THOMAS and ROONEY, JJ.
ROSE, Chief Justice.
The Uniform Commercial Code provides that except in certain circumstances a bank is liable for the amount of a check which it fails to timely dishonor. Section 34-21-451, W.S. 1977 (U.C.C. § 4-302). In this case, the appellee presented a check payable to itself to the appellant bank. The payor had insufficient funds on deposit with the bank to cover the check. The bank dishonored the check but failed to do so within the time *228 mandated by the Uniform Commercial Code.
Appellee then sued in district court for the face amount of the check, interest and costs. The district court agreed with the appellee that the bank was liable under the Code and gave judgment accordingly. The bank has appealed and argues that its "excuse" for failing to timely dishonor the check is sufficient under the Code to enable it to escape liability. Section 34-21-408(b), W.S. 1977 (U.C.C. § 4-108(2)).
We shall affirm the trial court.
The case was tried on stipulated facts. However, before presenting the stipulation, it is appropriate to reproduce the controlling Code provisions.

THE STATUTES
Section 34-21-451 (U.C.C. § 4-302), supra, provides:
"(a) In the absence of a valid defense such as breach of a presentment warranty (subsection (1) of section 4-207 [§ 34-21-426(a)]), a settlement effected or the like, if an item is presented on and received by a payor bank the bank is accountable for the amount of:
"(i) A demand item other than a documentary draft whether properly payable or not if the bank, in any case where it is not also the depositary bank, retains the item beyond midnight of the banking day of receipt without settling for it or, regardless of whether it is also the depository bank, does not pay or return the item or send notice of dishonor until after its midnight deadline; or
"(ii) Any other properly payable item unless within the time allowed for acceptance or payment of that item the bank either accepts or pays the item or returns it and accompanying documents."
The term "midnight deadline" is defined in § 34-21-404(a)(viii), W.S. 1977 (U.C.C. § 4-104(1)(h)):
"(viii) `Midnight deadline' with respect to a bank is midnight on its next banking day following the banking day on which it receives the relevant item or notice or from which the time for taking action commences to run, whichever is later;"
Section 34-21-408(b) (U.C.C. § 4-108(2)), supra, provides:
"(b) Delay by a collecting bank or payor bank beyond time limits prescribed or permitted by this act or by instructions is excused if caused by interruption of communication facilities, suspension of payments by another bank, war, emergency conditions or other circumstances beyond the control of the bank provided it exercises such diligence as the circumstances required." (Emphasis added.)[1]
In arguing that the delay in dishonoring the check was excusable, appellant bank also relies on 12 Code of Federal Regulations 210.14 which provides:
"If, because of interruption of communication facilities, suspension of payments by another bank, war, emergency conditions or other circumstances beyond its control, any bank (including a Federal Reserve bank) shall be delayed beyond the time limits provided in this part or the operating letters of the Federal Reserve banks, or prescribed by the applicable law of any State in taking any action with respect to a cash item or a noncash item, including forwarding such item, presenting it or sending it for presentment and payment, paying or remitting for it, returning it or sending notice of dishonor or nonpayment or making or providing for any necessary protest, the time of such bank, as limited by this part or the operating letters of the Federal Reserve banks, or by the applicable law of any State, for taking or completing the action thereby delayed shall be extended for such time after the cause of the delay ceases to operate as shall be necessary to take or complete the action, provided the bank exercises such diligence as the circumstances require."
*229 The bank points out that under § 34-21-403, W.S. 1977 (U.C.C. § 4-103), if not under the supremacy clause of the Federal Constitution, the above regulation is controlling law in Wyoming. We agree that the regulation controls but fail to see how it adds anything to § 34-21-408(b) (U.C.C. § 4-108(2)), supra. In light of the stipulated facts to be presented immediately below, it appears that either under the statute or the regulation the bank must show that its delay in dishonoring the check was due to circumstances beyond its control and that the bank exercised such diligence as the circumstances required.

THE FACTS
The stipulated facts are quoted below. As we understand the facts, both parties to this suit have acted in good faith and the plaintiff-appellee has made no showing that it was prejudiced by the untimely dishonor of the check. The untimely dishonor of the check was due to delay in delivering checks from a computer center in Billings, Montana, to the bank in Sheridan. Normally, the same courier delivering the checks to the Montana computer center from Sheridan would have driven them back to Sheridan after the center had processed them. However, after the check in issue had been taken to Billings, the main road between Billings and Sheridan became flooded. Although the courier could have taken an alternate route back to Sheridan, the check was instead given to Western Airlines by the computer center to be placed on the next morning's flight to Sheridan. For unknown reasons Western Airlines failed to deliver the check to Sheridan although it made its usual flight. Western Airline's failure to deliver the check to Sheridan as planned caused the bank to miss its Uniform Commercial Code deadline for dishonoring the check.

STIPULATION OF FACTS BY LITIGANTS
"The parties, Cabinet Craft Distributors, Inc., a Montana Corporation, and First Wyoming Bank, N.A. Sheridan, Wyoming, a Wyoming Corporation, by and through their undersigned attorneys enter into the following Stipulations and Admission of Facts for the purpose of simplifying the factual issues to expedite the litigation.
"I.
"The Defendant, First Wyoming Bank, is the payor bank on a check drawn on account # XX-XXX-X of Quality Kitchens, a division of Flynn's Inc., for Ten Thousand Dollars ($10,000.00). That check is Plaintiff's Exhibit `1' and is dated May 6, 1978. Plaintiff, Cabinet Craft Distributors, Inc., is the payee pursuant to that check. The parties stipulate that said check shall be admitted in evidence as Plaintiff's Exhibit `1' for all purposes.
"II.
"Plaintiff's Exhibit `1' was delivered to Jerry Franz of of [sic] Cabinet Craft Distributors, Inc., on May 6, 1978, as partial payment for cabinets and other related kitchen ware sold by Cabinet Craft Distributors, Inc., to Quality Kitchens prior to that date.
"III.
"Plaintiff's Exhibit `1' was then deposited in the account of Cabinet Craft Distributors, Inc., in the Security Bank of Billings on May 8th, 1978. Security Bank as the depository bank then credited the account of Cabinet Craft Distributors, Inc., in the amount of Ten Thousand Dollars ($10,000.00) and proceeded to send the check throught [sic] the bank collection system.
"IV.
"Plaintiff's Exhibit `1' was mailed from the Denver Federal Reserve Bank on May 20, 1978, to the Defendant, First Wyoming Bank of Sheridan, for payment.

*230 "V.
"Plaintiff's Exhibit `1' was received by the First Wyoming Bank of Sheridan, at the office of the bank as a cash item for payment on Monday, May 22, 1978, prior to 3:00 o'clock P.M. On May 22, 1978, the check was sent from the First Wyoming Bank Sheridan, to a computer center in Billings, Montana, run by Data Share, Incorporated, which the First Wyoming Bank uses to process its checks in the normal course of business. The check was taken by Jack Burns, an employee of Robert Collins, who contracts for the First Wyoming Bank as a courier to transport checks to the computer center in Billings. The courier would have left Sheridan [at] approximately 6:00 P.M. on May 22 and arrived in Billings between 8 and 10 P.M. The material would have been processed within an hour or two after its arrival in Billings.
"VI.
"The computer center printed Plaintiff's Exhibit `2' admitted in evidence for all purposes by stipulation of the parties, which Exhibit is entitled `Unposted Transaction Journal' and dated May 22, 1978.
"VII.
"In the Unposted Transaction Journal the catagory [sic] for Reason Not Posted was labeled Non Sufficient Funds due to a hold.
"VIII.
"In the normal course of business the courier would wait at the computer center until the checks have been processed and then return immediately with the checks and a computer print out to Sheridan showing all the checks processed by the computer center. On May 22, 1978, after the courier had gone through toward Billings, the main road between Sheridan, Wyoming, and Billings, was closed due to flooding for a period of several days. If the courier had delivered the checks through Lovell, Wyoming, and come across the Big Horn Mountains it would have been possible to have provided the checks to the First Wyoming Bank during the banking day of May 23, 1978.
"IX.
"Since the courier did not drive back to Sheridan, Wyoming, from Billings, the checks were placed by Data Share, Incorporated on Western Airlines, which was the normal procedure when the courier could not travel or when for computer reasons it took longer to run the checks than the courier could wait. Data Share turned the checks over to Western Airlines on May 22, 1978, to be taken to Sheridan in the early morning run of Western Airlines on May 23, 1978. The Western Airlines flight did leave Billings and did arrive at Sheridan at 8:13 A.M. but no checks were left in Sheridan for the First Wyoming Bank on May 23, 1978. The reason the checks were not delivered is unknown. Western Airlines destroys all records after one year. On May 25, 1978, the employees of First Wyoming Bank were notified by the First Wyoming Bank in Casper, Wyoming, that the checks had been received in Casper and the checks were subsequently placed on Continental Trailways and were received in Sheridan by Ruth Zimdars of the First Wyoming Bank on May 25, 1978. The Plaintiff's Exhibit `1' was posted out marked insufficient funds on May 25, 1978.
"X.
"On May 25, 1978, First Wyoming Bank President, Everett Cassidy, made the decision to dishonor the check, which is Plaintiff's Exhibit `1'. First Wyoming Bank employee Mary Seibel placed a stamp on the check showing that it was dishonored for insufficient funds.
"XI.
"Following the dishonor of the check at the First Wyoming Bank on May 25, *231 1978, the check was returned through the bank collection system through the Security Bank of Billings, which then reversed the credit placed on the account of the Plaintiff as of June 5, 1978. At all times between the receipt of the check on May 6, 1978, and June 5, 1978, the payee Cabinet Craft had no knowledge that there were insufficient funds to cover the check and the payee was at all times acting in good faith.
"XII.
"That from the 6th of May, 1978, when the check was received to the 16th of May there were not funds in the account of Quality Kitchens sufficient to pay the check. On the 16th of May, 1978, Tim Flynn deposited a check for Twenty-five Thousand Dollars ($25,000.00) in the account, written on an account in the Stockmen's Bank in Gillette, Wyoming, where he did not have Twenty-five Thousand Dollars ($25,000.00) on deposit. On May 22, 1978, after a meeting with Everett Cassidy, the President of the First Wyoming Bank, Tim Flynn made known that the Twenty-five Thousand Dollars ($25,000.00) deposit would not be covered by accounts in the Stockmen's Bank in Gillette. Everett Cassidy therefore from that date ordered a hold placed on all of Tim Flynn's accounts and there were not sufficient funds to pay the face amount of Exhibit `1' at any time. The hold was placed on the account on May 22, 1978."

WYOMING CASE LAW
The only Wyoming case discussing § 34-21-451 (U.C.C. § 4-302), supra, is American National Bank of Powell v. Foodbasket, Wyo., 493 P.2d 403 and 497 P.2d 546 (1972). (The earlier opinion was withdrawn on rehearing.) The case is not particularly relevant since the check payee in Foodbasket was not acting in good faith whereas the payee in the instant case is stipulated to have been acting in good faith.[2]

CASE LAW FROM OTHER JURISDICTIONS

Liability under U.C.C. § 4-302
Courts generally interpret U.C.C. § 4-302 (our § 34-21-451), supra, as imposing strict liability upon a bank which fails to dishonor a check in time unless the bank meets its burden of proving a valid defense. In Sun River Cattle Co., Inc. v. Miners Bank of Mont. N.A., 164 Mont. 237, 521 P.2d 679, 684 (1974), reh. den., the Montana Supreme Court spoke of U.C.C. § 4-302 as imposing a "standard of strict accountability" and cited the Official Code Comment for the proposition that the bank has the burden of proving an excuse under U.C.C. § 4-108(2) (our § 34-21-408(b)), supra. Sun River Cattle Co., supra, 521 P.2d at 685 and also citing 3 Anderson, Uniform Commercial Code 191. The United States Tenth Circuit Court of Appeals has said that if it is shown that a check has not been dishonored within the Code time limit, a prima facie case is established for imposing liability on the bank and the bank has the obligation of proving an excuse for untimely dishonor under U.C.C. § 4-108(2) (our § 34-21-408(b)), supra. Port City State Bank v. American National Bank, Lawton, Okl., 10 Cir., 486 F.2d 196, 198 (1973). The United States Fifth Circuit Court of Appeals recently said, "Failure ... to perform these duties within the time limits prescribed [by U.C.C. § 4-302] mandates the imposition of strict liability for *232 the face amount of any late instrument. * * *" Union Bank of Benton v. First Nat. Bank, 5 Cir., 621 F.2d 790, 795 (1980). The Supreme Court of New Mexico has said, "The liability created by [U.C.C. § 4-302 (our § 34-21-451), supra] is independent of negligence and is an absolute or strict liability for the full amount of the items which it fails to return, * * *" Engine Parts v. Citizens Bank of Clovis, 92 N.M. 37, 582 P.2d 809, 815 (1978).
Both the Illinois Supreme Court and the Kentucky Court of Appeals have rejected arguments that a bank which fails to timely dishonor a check under U.C.C. § 4-302 (our § 34-21-451), supra, is only liable if the delay in the dishonoring of the check injured the check's payee. Rock Island Auction Sales v. Empire Packing Co., 32 Ill.2d 269, 204 N.E.2d 721, 723-724 (1965); and Farmers Coop. Livestock Mkt. v. Second Nat. Bank, Ky., 427 S.W.2d 247, 250 (1968).
Other cases which have come to similar conclusions concerning the relevant Code provision include: Pecos County State Bank v. El Paso Livestock, Tex.Civ.App., 586 S.W.2d 183, 187 (1979), reh. den.; and Templeton v. First Nat. Bank of Nashville, 47 Ill. App.3d 443, 5 Ill.Dec. 720, 362 N.E.2d 33, 37 (1977).
Thus, since there is no issue of bad faith, our examination of appellant bank's claim of a valid excuse under U.C.C. § 4-108(2) (our § 34-21-408(b)), supra, does not entail a consideration of the equities involved. Rather our task is simply to determine whether the record demonstrates a sufficient excuse under the above statute.

CASE LAW FROM OTHER JURISDICTIONS

Excuses under U.C.C. § 4-108(2)
It is obvious that the flooded road between Billings and Sheridan which disrupted the normal procedure for delivery of the check was a "circumstance beyond the control of the bank" as contemplated by § 34-21-408(b) (U.C.C. § 4-108(2)), supra. Our inquiry is whether the bank used "such diligence as the circumstances required," in allowing the Montana computer center to give the check to Western Airlines for delivery and in not following up the failure of the airline to deliver the packet on schedule. In answering this question we must consider that the stipulated facts show that the bank had an alternative to using Western Airlines: its courier could have taken a different route. We are also somewhat handicapped by a lack of information. For example, although we know that the bank had previously used the airline's delivery service, we do not know what the airline's previous record for timely deliveries had been. We do not know if the computer center in turning the check over to the airline emphasized the need for a timely delivery. We do not know if the bank could have traced the checks which failed to arrive on the Western Airlines flight and gotten them sooner.
We have found no case involving a claimed U.C.C. § 4-108(2) (our § 34-21-408(b)), supra, excuse identical to the one involved here and only a few cases involving somewhat similar excuses. Surveying the area in 1977 the Kentucky Court of Appeals found "only two cases involving the application of U.C.C. § 4-108 to a payor bank's midnight deadline." Blake v. Woodford Bank & Trust Co., Ky.App., 555 S.W.2d 589, 594 (1977). The two cases found by the Kentucky court are Sun River Cattle Co., supra, and Port City State Bank, supra. We have not been able to discover any cases in addition to the Kentucky, Montana and Tenth Circuit decisions.
The Montana case is, perhaps, most in point. A bank in Butte, Montana, had its checks processed at a computer center in Great Falls, Montana. In the usual course of business the Butte bank's checks were sent by armored car to Great Falls for processing. Ordinarily, the checks would leave Butte at 5:00 or 6:00 p.m. on the day of receipt, arrive at Great Falls about 10:30 p.m., be processed by 11:30 p.m., be loaded back onto the armored car headed for Butte at 4:00 a.m. and arrive back in Butte at 7:00 a.m. Sun River Cattle Co., supra, 521 P.2d at 684.
*233 Unfortunately for the Butte bank, it received some checks on May 11, 1970. That day the armored car broke down and did not reach Great Falls until 1:30 a.m., May 12. Moreover, the computer in Great Falls malfunctioned with the result that the checks were not returned to Butte until 2:30 p.m. on May 12, rather than at 7:00 a.m. on that date. The Butte bank's "midnight deadline" for dishonoring the checks was midnight of May 12. Id. and U.C.C. § 4-104(1)(h) (our § 34-21-404(a)(viii)), supra. Thus, even though the armored car and computer breakdowns threw the bank off its normal schedule, it would have been physically possible for the bank to have dishonored the checks by midnight of May 12. The bank was unable to offer an explanation for failing to dishonor the checks by midnight of May 12.
The Montana court said:
"Under the exception of section 4-108(2) the bank must show: (1) A cause for the delay; (2) that the cause was beyond the control of the bank; and (3) that under the circumstances the bank exercised such diligence as required. In the absence of any one of these showings, the excuse for the delay will not apply, and the bank will be held liable under the provisions of section 4-302. * * *" (Emphasis added.) 521 P.2d at 686.
Along these lines our appellee urges that we note that there is no evidence in the record that the appellant bank made any efforts to trace the checks when they did not arrive in Sheridan aboard the Western Airlines flight as scheduled. Perhaps a trace started on the missing checks that morning would have enabled the bank to obtain the checks that day and meet the midnight deadline for dishonoring the insufficient-funds check which is the focus of this appeal.
However, although the appellant does not discuss this case, there is a distinguishing feature about Sun River Cattle which favors the appellant's cause. In the Montana case the checks in question were drawn on a business greatly indebted to the Butte bank and in precarious financial shape. The Montana court stated that it was holding the Butte bank to a stricter standard of proof under U.C.C. § 4-108(2) (our § 34-21-408(b)), supra, than would ordinarily be required. Sun River Cattle, supra, 521 P.2d at 685.
Our appellant bank relies almost solely on the Tenth Circuit case. Port City State Bank, supra. In this case the defendant, American National Bank, failed to timely dishonor two checks submitted to it by Port City State Bank. It was stipulated that the midnight deadlines for the two checks were December 1, and December 3. On December 1, American National computerized its operations and the computer broke down on its inauguration day. Despite assurances from the manufacturer that it could be repaired quickly, the computer was not repaired until late at night. When it became apparent that the computer could not be rapidly repaired, American National decided to use an identical computer in a bank some two and a half hours away, under a previous backup arrangement. Processing of checks was begun at 11:30 p.m. on December 1 on the backup bank's computer. Work was proceeding nicely on the backup computer when American National was notified by the computer manufacturer that its own computer was ready. The American National employees returned to their own bank. American National's computer worked for awhile and then broke down on December 2 and was rendered inoperable until a replacement part was installed on December 4. Because of the second failure of its new computer, American National Bank was again forced to utilize its backup arrangement. However, because of the distance between the American Bank and its backup computer, and the need of American to work around the schedule of the bank which owned the backup computer, American got behind in its processing.
The district court held that the cause of the delay in dishonoring the checks was the computer breakdowns, and the Tenth Circuit, applying its usual appellate rules, concluded that the holding was "not clearly erroneous." Port City State Bank, supra, *234 486 F.2d at 199. The Tenth Circuit also found that American reasonably relied on the assurance of the computer manufacturer that the initial malfunction could be repaired quickly; thus, the Tenth Circuit held that the bank was justified in not using the backup computer earlier. Id. at 200. Also, the Tenth Circuit accepted the argument that the bank's duty when the emergency became apparent was to remain open and serve its customers as best it could. "To abandon the orderly day by day process of bookkeeping to adopt radical emergency measures would have likely prolonged the delay in returning the bank to normal operations," the court said. Id. at 200.
As pointed out earlier, the Tenth Circuit stated in this case that it was the defendant bank's burden to prove an excuse under U.C.C. § 4-108(2) (our § 34-21-408(b)), supra. We agree with our appellee in this case that the Tenth Circuit case is readily distinguishable from the case before us. The defendant bank in the Tenth Circuit case proved to the satisfaction of the trial court that it used the diligence required by the above statute and that its failure to timely dishonor the checks was due to circumstances beyond its control  computer breakdowns. The showing of diligence included proof of utilization of a backup system. In the case before us, there is no showing that defendant-appellant bank used any diligence when the packet of checks failed to arrive as scheduled on the flight from Montana.
The Kentucky case involved a failure to timely dishonor two checks. Blake, supra. The two checks in this case were presented for payment to the defendant bank on December 24, 1973, so that under the midnight-deadline rule the bank was responsible for dishonoring the checks by midnight of December 26, December 25, of course, being a bank holiday. Blake, supra, 555 S.W.2d at 591. Unfortunately for the bank, it did not send notice that it was dishonoring the checks until December 27. In the trial court the bank sought to justify the delay for several reasons. The bank presented evidence that while it normally processes only 4,200 to 4,600 checks a day, it had 6,995 to process on December 26. The bank had four posting machines but two broke down on December 26, one for two and a half hours and one for one and a half hours. Also, one of the four regular bookkeepers was absent on December 26 and had to be replaced by a less proficient substitute. The bank regularly employed a Purolator courier to pick up checks at 4:00 p.m. and take them to the Federal Reserve bank. Because of the above-described problems, the bank did not have the two checks in question processed on December 26 in time for the Purolator courier. Id. at 595-596.
The trial court found these excuses sufficient under U.C.C. § 4-108(2) (our § 34-21-408(b)), supra, to relieve the bank of liability under U.C.C. § 4-302 (our § 34-21-451), supra. The Kentucky appellate court reversed. The appellate court focused on additional facts. One of the bookkeepers had in fact discovered that there were insufficient funds to pay the two checks on December 26 after the Purolator courier left. However, because of "the lateness of the hour" there was no responsible bank official on the premises and the bookkeeper merely left the two checks on the desk of the bank official who was supposed to handle insufficient funds checks. Id. at 596. Thus, the bank did not send out notice that it was dishonoring the check until the next day.
The Kentucky appellate court concluded:
"Even though the bank missed returning the two checks by the Purolator courier, it was still possible for the bank to have returned the checks by its midnight deadline. Under UCC § 4-301(4)(b) [footnote] an item is returned when it is `sent' to the bank's transferor, in this case the Federal Reserve Bank. Under UCC § 1-201(38) [footnote] an item is `sent' when it is deposited in the mail. 1 R. Anderson, Uniform Commercial Code § 1-201 pp. 118-119 (2d ed. 1970). Thus, the bank could have returned the two checks before the midnight deadline by the simple procedure of depositing the two checks in the mail, properly addressed to the Cincinnati branch of the Federal Reserve Bank.

*235 "This court concludes that circumstances beyond the control of the bank did not prevent it from returning the two checks in question before its midnight deadline on December 26. The circumstances causing the delay in the bookkeeping department were foreseeable. On December 26, the bank actually discovered that the checks were `bad,' but the responsible employees and officers had left the bank without leaving any instructions to the bookkeepers. The circuit court erred in holding that the bank was excused under § 4-108 from meeting its midnight deadline. The facts found by the circuit court do not support its conclusion that the circumstances in the case were beyond the control of the bank." 555 S.W.2d 596-597.
The cases discussed above persuade us that the appellant bank has failed to prove an excuse sufficient under § 34-21-408(b) (U.C.C. § 4-108(2)), supra, to enable it to escape liability under § 34-21-451 (U.C.C. § 4-302), supra, for its failure to dishonor the check in question by the midnight deadline imposed by the U.C.C.
The judgment of the district court is affirmed.
NOTES
[*] Chief Justice as of January 5, 1981.
[**] Chief Justice at time of oral argument.
[1] For unknown reasons the word "required" is in the past tense for our statute and in the present tense in the 1972 Official Text of the Uniform Commercial Code.
[2] The Montana Supreme Court has said that U.C.C. § 4-302 (our § 34-21-451), supra, is modified by U.C.C. § 1-203 (our § 34-21-122, W.S. 1977), which states:

"Every contract or duty within this act [§§ 34-21-101 to XX-XX-XXXX] imposes an obligation of good faith in its performance or enforcement."
Sun River Cattle Co., Inc. v. Miners Bank of Mont. N.A., 164 Mont. 237, 521 P.2d 679, 684 (1974), reh. den. Good faith is defined in U.C.C. § 1-201(19) (our § 34-21-120(a)(xix), W.S. 1977) which provides:
"(xix) `Good faith' means honesty in fact in the conduct or transaction concerned;"
Thus, a bad faith check payee may not demand enforcement of U.C.C. § 4-302 (our § 34-21-451), supra.
This analysis by the Montana Supreme Court is sound and consistent with our opinion in Foodbasket, supra.