No. 12511

IN THE SUPREME COURT OF THE STATE OF MONTANA

1974

---

SUN RIVER CATTLE CO., INC., a
Corporation; LOUIS SKAAR & SONS;
and BRUCE E. BECK & SONS,

Plaintiffs and Appellants,

-vs-

MINERS BANK OF MONTANA N.A., a
Banking Corporation,

Defendant and Respondent.

---

Appeal from: District Court of the Second Judicial District,
Honorable James D. Freebourn, Judge presiding.

Counsel of Record:

For Appellants:

Corette, Smith and Dean, Butte, Montana
Kendrick Smith argued, Butte, Montana

For Respondent:

Alexander, Kuenning and Miller, Great Falls, Montana
Paul D. Miller argued, Great Falls, Montana
Henningsen, Purcell and Genzberger, Butte, Montana

For Amici Curiae:

Wesley Wertz, Helena, Montana
Turnage and McNeil, Polson, Montana
Luxan, Murfitt and Davis, Helena, Montana

---

Submitted: March 18, 1974

Decided: APR 17 1974

Filed: APR 17 1974

_Thomas J. Kearney_
Clerk

PER CURIAM:

This appeal was originally heard on November 27, 1973; an opinion issued January 14, 1974; a rehearing was granted and argued. This opinion replaces that appearing in 31 St.Rep. 44.

This is a case involving three separate plaintiffs and six separate checks. The plaintiffs are cattle raisers and brought this action to recover $74,868.02, plus interest which represents the total of the six checks drawn by Schumacher's New Butte Butchering, hereinafter referred to as New Butte, on its account at Miners Bank of Montana, hereinafter referred to as Miners. One check was payable to Bruce Beck & Son, two to Louis Skaar & Sons, and three to Sun River Cattle Co., who will be referred to hereinafter, respectively, as Beck, Skaar and Sun River individually and as plaintiffs collectively. Each of the checks was accepted by the plaintiff payees in payment for cattle sold and delivered to New Butte. A summary of the history of all six checks is as follows:

The Beck check dated April 28, 1970, was for the amount of $12,478.63. This check was sent by Beck's bank to Miners, stamped "Paid", run through New Butte's checking account and deducted from the balance on May 11, 1970, (a Monday). The check was reversed and added to the balance on May 13, 1970, and returned to Beck's bank for insufficient funds. The check was sent back to Miners, stamped "Paid", run through New Butte's checking account, deducted from the balance on May 20, 1970, reversed on May 21, 1970, and returned to Beck's bank for insufficient funds. It was then returned to Miners "for collection" June 4, 1970, received by Miners on June 8, 1970, and retained by Miners until July 7, 1970, when it was returned to Beck's bank.

The first Skaar check, dated April 14, 1970, was for the amount of $11,514.74. This check was sent by Skaar's bank to Miners, stamped "Paid", run through New Butte's checking account, deducted from the balance on April 27, 1970, reversed April 28, 1970, and added to the balance and returned to Skaar's bank for insufficient funds on April 28, 1970. The check was sent back to Miners, run through New Butte's checking account and deducted from

- 2 -

the balance on May 11, 1970, reversed and added to balance May 13, 1970, and returned to Skaar's bank for insufficient funds. It was returned by Skaar's bank "for collection" on May 15, 1970, received by Miners on May 18, 1970, and retained by Miners until July 27, 1970, when it was returned to Skaar's bank.

The second Skaar check, dated May 4, 1970, was for the amount of $12,434.26. This check was sent by Skaar's bank to Miners, stamped "Paid", run through New Butte's checking account, deducted from the balance on May 12, 1970, reversed on May 13, 1970, and added to the balance and returned to Skaar's bank for insufficient funds. The check was returned by Skaar's bank to Miners "for collection", received by Miners on May 20, 1970, and retained by Miners until July 27, 1970, when it was returned to Skaar's bank.

The first Sun River check, dated April 27, 1970, was for the amount of $12,882.57. This check was deposited in the First National Bank of Great Falls on April 28, 1970, and sent to Miners. It was stamped "Paid May 1, 1970", run through New Butte's checking account and deducted May 1, 1970, (a Friday). The check was reversed and added to the balance on May 4, 1970, (a Monday) and returned to First National Bank of Great Falls. The check was sent back to Miners "for collection" on May 8, 1970, received by Miners on May 11, 1970, and has never been returned.

The second Sun River check, dated May 4, 1970, in the amount of $13,114.23, and the third Sun River check, dated April 1, 1970, (although the invoice for this load of cattle is dated April 28, 1970) in the amount of $12,443.59, were both sent to Miners directly "for collection". The second check was sent on May 6, 1970, and received by Miners on May 7, 1970, and the third was sent on May 12, 1970, and received by Miners May 13, 1970. These checks have never been returned. None of the checks have been paid.

In 1962 the original transaction between Miners and New Butte took place when Miners loaned New Butte some $289,500. In 1968 refinancing of New Butte became necessary in an amount in excess of Miners' lending capacity.

Refinancing was carried out with two separate loans. One was for

- 3 -

$200,000 with Miners having a 30% participation and the remaining 70% spread among seven sister banks. The other was for $100,000, 90% of which was guaranteed by the Small Business Administration (hereinafter referred to as SBA). The loans were made to provide working capital, and to comply with federal regulations as to slaughterhouses.

Miners filed financing statements with the county clerk of Silver Bow County and the secretary of state. A list of equipment was attached to the statement filed with the secretary of state; no such list was attached to the one filed with the county clerk and recorder. No amounts being secured are shown on the statements but Mr. Pitts, Miners' president at the time, stated that they were designed to cover both loans. Witness Pitts testified that the lien of the $200,000 loan was first as to all equipment but that the $100,000 loan was first as to the accounts receivable and inventory.

Miners also took mortgages securing the $200,000 loan as follows: mortgage on New Butte's plant and a mortgage from Harold F. Schumacher and Loretta Schumacher covering their home and personal property. Securing the $100,000 loan Miners took a mortgage from New Butte to Miners covering the plant and equipment and a mortgage from the Schumachers covering their home and personal property.

In each instance the mortgage securing the $200,000 loan was filed first. None of these mortgages has been foreclosed.

Miners also filed a security agreement with the registrar of motor vehicles securing the $200,000 loan and also took an assignment on Schumacher's life insurance as security for the $200,000 loan. The policies were cashed for the cash value.

In December of 1969, New Butte closed down its operation for financial reasons. Operations were resumed in January 1970. At this time a financing firm, Douglas Guardian, with its program of warehousing receipts and accounts receivable financing became involved in cooperation with Miners and New Butte. Advances by Miners under the warehouse receipts plan approximated $390,000. The amounts advanced by Miners under the accounts receivable financing exceeded

$400,000. The warehouse receipts program started January 15, 1970, and ended May 22, 1970; the accounts receivable financing covered a period from January 30, 1970, to May 11, 1970.

During the first seven months of 1970, the New Butte checking account was overdrawn in amounts ranging from nominal to as much as $55,000 for all but 87 of those days.

As of May 18, 1970, the $100,000 loan was current in payments. All payments on the $200,000 were made currently through May 28, 1970. On June 2, 1970, the SBA took over the assets of the business. Neither loan was in default at that time. On May 29 and June 1, 1970, Miners' president, Pitts, debited the New Butte account for $12,000 and $9,000 and credited those amounts to the $100,000 SBA loan.

Pitts admitted that he was looking carefully to the account on May 29, 1970, so that he could put in the withdrawal slip for $12,000 and be sure that Miners got ahead of anybody else. He stated that he personally handled the withdrawal.

As to the $9,000 withdrawal, Pitts testified that he kept strict watch of the account and when there was enough deposited, he personally put in a withdrawal slip. On June 18, 1970, Miners credited the $200,000 loan with $4,602, which represented 30% of the total of $15,342 as the result of a sale of equipment by New Butte. The proceeds were not deposited in New Butte's account but were applied directly to the $200,000 loan and that credit was enough to discharge in advance the principal and interest for six months. There was no foreclosure of the security interests nor were the proceeds of the sales placed into New Butte's account.

The bank in this instance knew of the condition of the account of New Butte, it had intimate knowledge of the transactions, it was the "on the ground" representative of the sister banks who shared in the loan and it had more than the usual normal interest in the activities of New Butte.

Plaintiffs brought this action against New Butte and Miners to re-cover the amounts of the checks plus interest and damages. After a trial

without a jury in the second judicial district, Judge James D. Freebourn presiding, found for the plaintiffs against New Butte and found against the plaintiffs and for defendant Miners. Plaintiffs appeal that part of the judgment which exculpated Miners.

Plaintiffs present five issues for review, which are summarized as follows: (1) Whether Miners is liable for holding the Beck check and the first Skaar check past the midnight deadline provided for in section 87A-4-302, R.C.M. 1947, and (2) whether Miners is liable for holding all six of the checks past the midnight deadline as provided for in the statute. Plaintiffs' remaining issues involve the question of good faith, which the district court specifically found was exercised by Miners in its dealings with plaintiffs. The question of good faith will be considered in connection with plaintiffs' first two issues.

This case involves sections of the Uniform Commercial Code enacted in Title 87A, R.C.M. 1947. The issues presented by plaintiffs are of first impression to this Court, and there are few cases in other jurisdictions which have construed the effect of the sections of the Uniform Commercial Code which are determinative of the issues presented for review.

Plaintiffs' first and second issues raise questions concerning Article 4 of the Uniform Commercial Code. (Hereafter, references to the Uniform Commercial Code will be made by the section number only; the title number will be omitted). Generally plaintiffs argue that Miners is liable for the face amount of the checks for not complying with what is commonly referred to as the "midnight deadline" rule. Defendant argues that with respect to the first issue section 4-108 is an exception to section 4-302 and with respect to the second issue section 4-103 is an exception to section 4-302 and under these sections Miners is not liable. Initially, we will generally discuss the construction of section 4-302, which provides:

> "In the absence of a valid defense such as breach of a presentment warranty (subsection (1) of section 87A-4-207), settlement effected or the like, if an item is presented on and received by a payor bank the bank is accountable for the amount of

- 6 -

"(a) a demand item other than a documentary draft whether
properly payable or not if the bank, in any case where
it is not also the depositary bank, retains the item
beyond midnight of the banking day of receipt without
settling for it or, regardless of whether it is also
the depositary bank, does not pay or return the item
or send notice of dishonor until after its midnight
deadline; or * * *."

The "midnight deadline" is midnight of the banking day following the
day of the receipt of the item by the payor bank. Section 4-104(h). A
payor bank is a bank by which an item is payable as drawn or accepted.
Section 4-105(b). There is no question but that Miners is the payor bank.
The checks involved herein are demand items. Section 4-104(g) and section
3-104(1) and (2).

Section 4-302 was construed in the case of Rock Island Auction Sales
v. Empire Packing Co., 32 Ill.2d 269, 204 N.E.2d 721, 18 ALR.3d 1368, where
the Illinois court held that the word "accountable" in the statute is synonymous
with "liable". We agree.

Essentially, section 4-302 says that in the absence of a valid de-
fense, a demand item, retained beyond the "midnight deadline" by the payor bank
without either paying, returning, or giving notice of dishonor renders the
payor bank liable to the payee for the face amount of the item.

In addition, there is a fundamental requirement of good faith under
the specific provision of section 1-201(19), which reads as follows:

"'Good faith' means honesty in fact in the conduct or
transaction concerned."

Furthermore, 1-203 provides:

"Every contract or duty within this act imposes an obligation
of good faith in its performance or enforcement."

Plaintiffs' first issue concerns the Beck check dated April 28,
1970, and the first Skaar check dated April 14, 1970. These checks were
submitted as cash items to Miners on May 11, 1970, and were not returned
until May 13, 1970. Plaintiffs contend that because of the delay that Miners
violated the "midnight deadline" rule. Facts not heretofore set forth
relevant to this issue and undisputed are as follows:

The Computer Corporation of Montana, a data processing company,

is a wholly owned subsidiary of Bancorporation of Montana which processed

checks for eleven banks in the Bancorporation chain, including Miners. Items

to be processed for Miners are sent to Computer Corporation in Great Falls

by armored car between 5:00 p.m. and 6:00 p.m. of the day of receipt and are

usually back at Miners by 8:00 a.m. the following morning. The checks norm-

ally reach Great Falls about 10:30 p.m. On May 11, 1970, the day on which

Miners received the checks under discussion, the armored car broke down and

did not reach Computer Corporation until 1:30 a.m. the morning of May 12,

1970. Ordinarily the work on Miners' checks would have been processed by

11:30 p.m.; the checks would have started back to Butte by armored car at

4:00 a.m. and have reached Miners at 7:00 a.m.

On the morning of May 12, 1970, the computer malfunctioned, and

the checks which would have normally been returned to Miners on the morning

of May 12, 1970, did not arrive until 2:30 p.m. that afternoon.

Ken Mahle, vice-president of Miners at the time of the trial,

outlined the procedures which were followed each day after the receipt of

the checks from the Computer Center. He could not, however, testify as to

what occurred on May 12, 1970. There was no testimony as to what actually

happened on the day after the checks were received by Miners.

Miners contend that it is this type of situation which section 4-108(2)

was intended to cover. Section 4-108(2) provides:

> "Delay by a collecting bank or payor bank beyond time
> limits prescribed or permitted by this act or by
> instructions is excused if caused by interruption of
> communication facilities, suspension of payments by
> another bank, war, emergency conditions or other cir-
> cumstances beyond the control of the bank provided it
> exercises such diligence as the circumstances require."

The Official Code Comment on this point states:

> "4. Subsection (2) is another escape clause from time
> limits. This clause operates not only with respect to
> time limits imposed by the article itself but also time
> limits imposed by special instructions, by agreement
> or by Federal Reserve regulations or operating letters,
> clearing house rules or the like. The latter time limits
> are 'permitted' by the Code. This clause operates,
> however, only in the types of situation specified.
> Examples of these situations include blizzards, floods,

- 8 -

or hurricanes, and other 'Act of God' events or conditions, and wrecks or disasters, interfering with mails; suspension of payments by another bank; abnormal operating conditions such as substantial increased volume or substantial shortage of personnel during war or emergency situations. When delay is sought to be excused under this subsection the bank must 'exercise such diligence as the circumstances require' and it has the burden of proof." (Emphasis supplied.) 3 Anderson, Uniform Commercial Code 191.

The effect of section 4-108(2) is to excuse a payor bank from the standard of strict accountability of section 4-302 and to hold it to a standard of "diligence as the circumstances require". Under section 4-108(2) there must be a showing that the circumstances were beyond the control of the bank and that the bank exercised such diligence as the circumstances require. As the Official Code Comment states, the burden is on the bank.

The district court found that Miners' failure to pay or return the checks or to give notice of dishonor within the prescribed time was due to circumstances beyond its control. The district court also found that Miners exercised the required diligence and that no evidence was introduced showing that Miners failed to exercise due care.

The evidence as to the events in question is undisputed. This Court in In re Wadsworth's Estate, 92 Mont. 135, 150, 11 P.2d 788 stated:

" * * * But where, as here, there is no dispute as to the facts, this court is in as favorable a position in applying the law as the district court, and in such instances will not hesitate to do so. (Citing authority.) And a judgment or order unsupported by the evidence will be reversed on appeal to this court. (Citing authority.)"

The only evidence produced by Miners was what the ordinary operating procedures were.

As we have heretofore stated, Miners had more than the usual normal interest in the activities of New Butte. It necessarily follows that under the circumstances of this case that the degree of diligence required under 4-108(2) is greater than under normal circumstances.

Miners argues that the testimony of Mahle as to normal operating procedures constitutes a showing of due diligence. While there may be instances where a showing as to what occurs on a normal operating day may

constitute a showing of diligence under circumstances where the delay is similar as to the one in the instant case, this case is not one of those instances. Miners' interest in New Butte was more than usual, and a showing of diligence by Miners required more than testimony as to what the normal operating procedures were. Miners' burden under the circumstances of this case is greater for the reason that its relationship and interest in New Butte was significantly more than ordinary. Miners did not meet its burden as imposed by section 4-108(2).

Under the exception of section 4-108(2) the bank must show: (1) A cause for the delay; (2) that the cause was beyond the control of the bank; and (3) that under the circumstances the bank exercised such diligence as required. In the absence of any one of these showings, the excuse for the delay will not apply, and the bank will be held liable under the provisions of section 4-302. Since Miners did not meet its burden, it is therefore liable for the face amount of the Beck check and the first Skaar check under the strict accountability rule of section 4-302.

Having illustrated that Miners had more than a normal interest in the activities of New Butte and that the exception of 4-108(2) is not applicable herein, we now consider plaintiff's second issue which concerns all six checks. For the reason that we have found in considering plaintiff's issue No. 1 that liability attached as to the Beck check and the first Skaar check as of May 13, 1970, under section 4-302, our consideration of the second issue will be with reference to the remaining four checks. The second Skaar check and the first Sun River check were ultimately sent to Miners "for collection". The second and third Sun River checks were sent directly to Miners for collection. The second Skaar check was received by Miners on May 20, 1970, and retained until July 27, 1970, a period of more than two months. The three Sun River checks were never returned by Miners.

Plaintiffs contend that Miners, the payor bank, may not become a collecting bank and therefore, cannot take a check for collection and hold the same beyond the regular midnight deadline. Plaintiffs rely upon the

following cases:

In <u>Rock Island</u> the seller of cattle received the buyer's $14,706.90 check on the same day. On that day the seller deposited the check in seller's bank and it was received by the payor bank on Thursday, three days later. The buyer's account in the payor bank was inadequate to pay the check, and the payor bank, relying on the buyer's assurances that additional funds would be deposited, held the check until the following Tuesday, when it marked the check "not sufficient funds", placed it in the mail to a Federal Reserve Bank and sent notice of dishonor by telegram to the Federal Reserve Bank. The court held the payor bank liable for the amount of the item under section 4-302.

Section 4-302 was also involved in the case of Farmers Coop. Livestock Mkt. v. Second Nat. Bank, 427 S.W.2d 247 (Ky. 1968). The buyer's alleged agent signed a draft in the amount of $7,687.01 payable to the seller. The instrument was drawn on the defendant bank and contained the notation "'To (be) Charged to Acct. of Robert Martin'". It was deposited with Northwestern Bank and sent by Northwestern direct to defendant bank on October 1, with an accompanying letter. The letter, among other things, stated:

> "'We enclose for collection * * *'
>
> "'Wire non-payment of items $1,000.00 or over.'
>
> "'Please send us your draft.'
>
> "'Please wire if unpaid upon arrival, but hold for
> payment with advice to us. * * *'"

The instrument was received by defendant bank on October 4, and although there were sufficient funds in Martin's account to pay the check, defendant bank had not been authorized by Martin to make payment, so no charge was made to his account. No wire was sent to Northwestern as Northwestern had requested. On October 6, Northwestern called the defendant bank and "'was told that Martin had not come into the bank to authorize payment of the instrument in question.'" It was undisputed that the defendant bank had failed to take action before the "midnight deadline".

There was a dispute as to whether the instrument was a "check" or a "draft". The Court said that this was an immaterial distinction and that the important question was whether the instrument was a demand item referred to

- 11 -

in section 4-302(a). The Court quoted the definition of an "item", and said a demand item would obviously be one on demand, and held the instrument in this case was a demand item. The Court also held that the defendant bank was clearly the "payor" bank and clearly liable for the amount of the item.

The defendant bank contended that it was a collecting bank because the letter accompanying the draft contained the words, "'We enclose for collection * * *'", and the defendant bank treated the item as a collection item. In this regard, the Court on page 250 said:

" * * * The use of the term 'collection' in the letter certainly cannot be said to have destroyed the statutory scheme governing the collection process. The letter also said 'Please wire if unpaid upon arrival'. This draft was presented for payment. (Had appellee wired as instructed, it would have discharged its duty as the payor bank and subsequent action to settle this account would have been governed by other considerations.) With respect to how appellee treated this item, we can only say that it took the risk of loss by failure to comply with the law. * * *"

Miners asserts several reasons why it is not liable under section 4-302. The first of these is that section 3-511(4) excuses notice of dishonor where a check has been presented to the bank and payment refused at least once before. Miners argues that the "midnight deadline" rule does not apply and relies on Leaderbrand v. Central State Bank of Wichita, 202 Kan. 450, 450 P.2d 1. Section 3-511(4) provides:

"Where a draft has been dishonored by nonacceptance a later presentment for payment and any notice of dishonor and protest for nonpayment are excused unless in the meantime the instrument has been accepted."

The Kansas court in Leaderbrand held that under section 3-511, once notice of dishonor had been given, an additional notice of dishonor was not required. In Wiley v. Peoples Bank and Trust Company, 438 F.2d 513, the court rejected Leaderbrand and held section 3-511(4) inapplicable for the reason that "acceptance applies only to time items. It has nothing to do with demand items." Likewise, we hold that section 3-511(4) is inapplicable to the checks under consideration herein, for section 3-511(4) does not apply to demand items.

Another reason contended by Miners takes into consideration the practice of submitting checks "for collection". It is Miners' position that

- 12 -

any obligation it may have had to observe the midnight deadline rule was negated under section 4-103 by specific agreement between the parties and by a general custom and practice within the banking industry for the handling of checks sent for collection. Section 4-103 provides in part:

> "Variation by agreement--measure of damages--certain action constituting ordinary care. (1) The effect of the provisions of this chapter may be varied by agreement except that no agreement can disclaim a bank's responsibility for its own lack of good faith or failure to exercise ordinary care or can limit the measure of damages for such lack or failure; but the parties may by agreement determine the standards by which such responsibility is to be measured if such standards are not manifestly unreasonable.
>
> "(2) Federal Reserve regulations and operating letters, clearinghouse rules, and the like, have the effect of agreements under subsection (1), whether or not specifically assented to by all parties interested in items handled.
>
> "(3) Action or nonaction approved by this chapter or pursuant to Federal Reserve regulations or operating letters constitute the exercise of ordinary care and, in the absence of special instructions, action or nonaction consistent with clearinghouse rules and the like or with a general banking usage not disapproved by this chapter, prima facie constitutes the exercise of ordinary care."

It is plaintiffs' position that since the checks here are demand items any agreement to vary the terms of section 4-302 is directly contrary to the express terms of the instruments. While section 4-302 holds a payor bank strictly liable, section 4-103 is clearly designed to make an exception to section 4-302 by agreement between the parties.

As the Official Code Comment states:

> " * * * Section 4-103 states the specific rules for variation of Article 4 by agreement and also certain standards of ordinary care. In view of the technical complexity of the field of bank collections, the enormous number of items handled by banks, the certainty that there will be variations from the normal in each day's work in each bank, the certainty of changing conditions and the possibility of developing improved methods of collection to speed the process, it would be unwise to freeze present methods of operation by mandatory statutory rules. This section, therefore, permits within wide limits variation of provisions of the Article by agreement." 3 Anderson, Uniform Commercial Code 165.

The question then becomes whether under the circumstances of the instant case there was an agreement between the parties excepting Miners from

the strict liability rule of 4-302.

The district court found that a prior course of dealing between plaintiffs and Miners shows the existence of an agreement. The definition of an agreement as used herein is found in section 1-201(3) where it states:

> "'Agreement' means the bargain of the parties in fact as found in their language or by implication from other circumstances including course of dealing or usage of trade or course of performance as provided in this act (sections 87A-1-205 and 87A-2-208). Whether an agreement has legal consequences is determined by the provisions of this act, if applicable; otherwise by the law of contracts (section 87A-1-103)." (Emphasis supplied.)

Section 1-205(1) provides as to course of dealing:

> "A course of dealing is a sequence of previous conduct between the parties to a particular transaction which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct."

Miners has attempted to establish a course of dealing as to plaintiff Sun River and plaintiff Skaar because each had one check sent for collection paid from the New Butte account after being held past the 'midnight deadline." The holding and paying of one check is not sufficient to form "a sequence of previous conduct" which is necessary to establish a course of dealing.

In addition, the Uniform Commercial Code does not contemplate that the course of dealing may constitute the entire agreement, but merely gives meaning to or supplements the express terms of an existing agreement. See 1 Anderson, Uniform Commercial Code 175, 176. Miners could show but one previous transaction--clearly insufficient to establish a course of dealing.

Miners also claims that Sun River used its banker, Malcolm Adams of the First National Bank of Great Falls, as its agent and that because Adams understood that the check would be held by Miners that this constituted an agreement. This asserted agreement between Miners and Sun River is ineffective in view of the fact of Miners' obvious lack of fairness and the standard imposed upon it by its own more than normal relationship with New Butte. Contrary to the district court's finding of good faith, it is this Court's

view that Miners did not act in compliance with fair dealings contemplated by the Uniform Commercial Code.

We present this question: How effective or reliable may an agreement be, assuming there is one, when the bank's president, himself, is looking closely to the account and withdraws money therefrom for purposes of applying the money to a loan which is not in default? It is true that a bank may have the right of setoff or may pay checks in any order that it chooses (section 4-303) or a secured party may upon default take possession of collateral without judicial process and dispose of it in any commercially reasonable fashion (sections 9-503 and 9-504). Under the facts here, however, Miners' unique position with relation to New Butte establishes a standard of care greater than under normal situations, and for any agreement to come within the exception in this case requires more than what Adams may have understood. In addition, Miners cannot shield itself by asserting that the alleged agreement is an exception in light of its own lack of fairness.

While Miners stood in an advantageous position with respect to its own interests, these plaintiffs stood with no recourse whatsoever after having provided essential inventory, namely cattle, for the operations of New Butte.

In its argument Miners also claims that oral notice of dishonor was given to plaintiff Skaar with respect to the check under consideration. Whereas, under sections 4-104(3) and 3-508, oral notice of dishonor may be sufficient to meet the requirements of section 4-302, the circumstances here required more than oral notice. In one conversation that Skaar had with Pitts on May 11, 1970, Pitts indicated that the checks would clear because things were looking better. Pitts did indicate, however, that it was going to take time. In view of what subsequently happened, any notice given to Skaar or purported agreement between Miners and Skaar under the facts here are not sufficient to release Miners from the strict liability rule of 4-302.

Defendant's final contention is that strict compliance with section 4-302 is also varied by custom and practice. The district court found that the established custom and practice followed by the banking industry in Montana in

handling checks "for collection" in the absence of special instructions and writing is to hold the check for an arbitrary length of time.

We have heretofore established that there was no agreement between the parties which varied the provisions of section 4-302. In the absence of an agreement the strict liability rule of section 4-302 applies. Custom and practice is relevant under section 4-103(3), if at all, only with respect to the establishment of what standard constitutes ordinary care. The standard of care imposed upon Miners in the instant case was more than ordinary, and therefore, custom and practice are not relevant.

Clearly, the four checks under consideration herein are subject to the rule of section 4-302. Miners cannot now claim that the statute is varied either by agreement as provided in 4-103 or by custom and practice, particularly where Miners has assumed a position in relation to its customer, New Butte, which imposes a greater standard of care and responsibility than under normal situations. Miners cannot prevail in its argument when it has demonstrated a disregard for good faith dealings contemplated by the Uniform Commercial Code.

For the foregoing reasons, the judgment of the district court is reversed.