REYNOLDS–WILSON LUMBER COM-PANY, d/b/a T R Cattle Company, an Oklahoma corporation, Plaintiff-Appel-lant,

v.

The PEOPLES NATIONAL BANK, Kingfisher, Oklahoma, Defendant-Appellee.

No. 58271.

Supreme Court of Oklahoma.

April 30, 1985.

Gary A. Bryant, Messrs. Mock, Schwabe, Waldo, Elder, Reeves & Bryant, Oklahoma City, for plaintiff-appellant.

Harold Logsdon, Messrs. Baker, Logsdon & Phelps, Kingfisher, for defendant-appellee.

PER CURIAM.

The plaintiff-appellant, Reynolds-Wilson Lumber Company, d/b/a T R Cattle Company [hereinafter "TRC"], is the payee of a $150,000 sight draft drawn against the account of Perdue & McCarthy Cattle Company [hereinafter "P & M"] with the defendant-appellee, The Peoples National Bank, Kingfisher, Oklahoma [hereinafter "PNB"]. TRC sought to recover the amount of the draft on a theory of absolute or strict liability arising from PNB's alleged breach of a statutory duty under 12A O.S. 1981 §§ 4–301 and 4–302 either to honor or return the draft before PNB's midnight deadline. The trial court, sitting without a jury, made written findings of fact and conclusions of law, and rendered judgment thereon for PNB. The Court of Appeals reversed the trial court's judgment. We agree with the Court of Appeals but grant certiorari to revise its opinion.

The basic facts are not in dispute. TRC sold some cattle to P & M. In accordance with a pre-existing practice which had developed in previous dealings between TRC and P & M, an employee of TRC prepared a draft, dated February 22, 1980, payable to the order of "T R Cattle Co." in the amount of $150,000, and specified thereon that it was in "part payment 3000 hd. $ $50.00/hd". The draft was signed "Perdue & McCarthy Cattle Co., By: Bernice Stephenson" (Ms. Stephenson being the

TRC employee who prepared the draft). The draft bore the printed legend: "Value received and charge to account of", below which was written in longhand the following:

"To Perdue & McCarthy Ctl. Co.
 Peoples National Bank
 Kingfisher, Oklahoma
 Acct # 0001627."

The draft was on the face of an envelope. There were no papers or documents placed in the envelope, which was sealed.

After the draft was prepared, it was deposited the same day in TRC's bank account with the Union State Bank of Carrizo Springs, Texas, [hereinafter "USB"], and USB immediately gave TRC provisional credit for the item.

USB mailed the draft directly to PNB, together with an accompanying "collection letter". These were received by PNB before the end of its business day on Friday, February 29, 1980. The USB "collection letter" was addressed to PNB; it indicated that USB's depositor was TRC and that the accompanying draft was drawn by P & M on "you", i.e., on PNB.

On the same day the draft and "collection letter" were received, PNB's cashier contacted a principal of P & M by telephone, advised that the draft had been received, and told him that P & M "needed to wire funds that very day" to pay the draft. The PNB cashier was advised that funds were not then available, but should be by the following Monday, March 3.

Later, on February 29, the manager of TRC telephoned the PNB cashier. They discussed the fact that P & M did not have funds to cover the draft that day, but should have sufficient funds by Monday. TRC's manager then told the PNB cashier to hold the draft until the following Monday, and pay it then.

On the following Monday, March 3, (which was PNB's next business day), P & M did not deposit any funds to its account with PNB to cover the draft. During that day, the TRC manager again telephoned the PNB cashier. TRC's manager was ad-

vised that no funds had been deposited to P & M's account with PNB that day. They discussed that the P & M principal with whom the PNB cashier had communicated the preceding Friday was "out of town". The TRC manager did not instruct the PNB cashier to hold the draft any further, nor was there any discussion concerning further retention of the draft by PNB.

PNB did not return the draft prior to midnight, March 3. On the following Friday, March 7, the P & M principal, with whom PNB's cashier had been dealing, returned from his out-of-town trip and advised PNB in person that funds were not available to pay the draft. PNB then returned the draft unpaid to USB, which received it on March 12.

The draft was subsequently mailed by USB to PNB a second time, along with a letter from USB's attorney demanding payment. These were received by PNB on March 20, 1980. The next day, PNB's attorneys responded by letter to USB's attorney, taking the position that PNB had orally advised TRC the day the draft was received that it "could not be honored" (it is not clear whether the receipt referred to in this letter was PNB's initial receipt of February 29, or second receipt on March 20). PNB's attorneys also advised that unless they could be furnished with "persuasive authority" to the contrary, their advice to PNB would be to decline the demand for payment. The draft was not returned by PNB, and USB subsequently sent out a "tracer" to locate the draft. The "tracer" was received by PNB on April 17, and the draft returned unpaid by PNB to USB that same day.

The judgment of the trial court for PNB and against TRC was predicated on several conclusions of law. To these contested conclusions we now turn.

The trial court's principal conclusion was that PNB was not a payor bank which, under 12A O.S. 1981 § 4–302(a), became accountable for the draft when it retained it beyond midnight of March 3, 1980. Rather, the trial court held that the draft was drawn *"through or at"* PNB rather

than *on* PNB, and that PNB was therefore only a collecting and presenting bank, obligated to make collection in accordance with the "collection letter" which accompanied the draft. The court further ruled that (a) under 12A O.S.1981 § 3–504 presentment could only be made by mail or in person, not by phone; (b) that presentment did not occur until March 7, when a principal of P & M came to PNB; (c) that the draft was dishonored by P & M on March 7; and (d) that PNB's return of the draft on March 7 was within the time required after the presentment and dishonor which had occurred on that date.

■ The trial court's legal conclusion that PNB was not a payor bank is incorrect. A "payor bank" is one by which an item is payable as drawn or accepted. 12A O.S.1981 § 4–105(b). It includes a drawee bank. Official Comment 2 to § 4–105. The question then is whether the draft in question was drawn on PNB as sole drawee or as co-drawee with P & M, or, as the trial court concluded, drawn on P & M as sole drawee, payable "at or through" PNB.

■ The trial court cited no decisional authority for its conclusion that PNB was not a payor bank. On the other hand, the cases which have been decided under the Uniform Commercial Code in other jurisdictions hold that designations such as that utilized here, to-wit:

"To Perdue & McCarthy Ctl. Co.
Peoples National Bank
Kingfisher, Oklahoma
Acct # 0001627."

result in both P & M and PNB being drawees, with the further result that PNB is a payor bank. See *Pecos County Bank v. El Paso Livestock Auction Co., Inc.*, 586 S.W.2d 183 [Tex.Civ.App.1979]; *Farmers Cooperative Livestock Market, Inc. v. Second National Bank of London*, 427 S.W.2d 247 [Ky.App.1968]; *New Ulm State Bank v. Brown*, 558 S.W.2d 20 [Tex.Civ. App.1977] and *Engine Parts v. Citizens Bank of Clovis*, 92 N.M. 37, 582 P.2d 809 [1978].

Thus in *Pecos County, supra,* the following designation,

"Value Received and Charged to Account of
Mesa Packing Company
Pecos County State Bank
Fort Stockton, Texas,"

was held on summary judgment to result in both Mesa Packing Company and the bank being drawees. The Texas court held that there was no genuine issue of material fact as to the construction to be given the draft, and, as a matter of law, construed it to create co-drawees. In *Pecos County, supra,* the court relied on *New Ulm, supra,* which had construed the designation

"R & A Farms
New Ulm State Bank
New Ulm, Texas,"

as creating co-drawees.

PNB does not attempt to distinguish these cases, but instead simply brushes them aside because they were decided in other jurisdictions. We find them persuasive, however, in the absence of any Oklahoma decisions on the point, and in view of the policy of the Oklahoma Uniform Commercial Code " * * * to make uniform the law among the various jurisdictions * * * ". 12A O.S.1981 § 1–102(2)(c).

■ As previously noted, the trial court concluded without citation of decisional authority that the draft here in issue was payable *"through or at"* PNB, but was not drawn *on* PNB, with the result that PNB was a collecting bank but not a payor bank. But to be a "payable through" or "payable at" item, it must expressly so state on its face. See 12A O.S.1981 §§ 3–120 and 3–121. The draft here nowhere states that it is payable "through" or "at" PNB. Applicable rules of construction dictate that the bank in such cases be held at least a co-drawee and payor, absent *express* designation to the contrary. As stated in *Engine Parts, supra,* at 813:

"To make a draft payable 'through' or 'at' a bank, and thus designate the bank as a mere conduit for payment and not as

a 'payor' bank directly ordered to pay, the *drawer* of the draft, must expressly write the word 'through,' 'pay through,' 'at,' 'payable at,' or similar words before the name of the bank *on the instrument itself.*"

█ The trial court apparently considered two other factors as indicating that PNB was a collecting and presenting bank but not a payor. First, it emphasized that the letter from USB accompanying the draft when it was received by PNB on February 29 was a "collection letter". Thus, the court stated in its Conclusion of Law No. 4 that "Collection letter attached to draft sent to PNB, instructs that it is envelope draft for collection, papers attached. PNB must act according to instructions and is not liable to T R Cattle Co. for following instructions." The short answer to this conclusion is that it does not matter what USB's letter stated. The construction to be given the draft is to be ascertained from the face of the draft itself. See *Engine Parts, supra,* at 812, where it is stated that:

" * * * Engine Parts argues that the collection letter should not be considered in determining whether the Clovis Bank was a payor bank. This latter contention is correct. The status of a negotiable instrument is to be determined from its face—from the language used or authorized to be used thereon by its drawer or maker—*and not from documents attached thereto by other parties*....

\* \* \* \* \* \*

... Thus, information or instructions on a collection letter attached by a depository or collecting bank are irrelevant in ascertaining who the drawee of the instrument is or whether a bank is a payor or collecting bank. * * *" [emphasis ours]

See also *Engine Parts, supra,* at 814–815; *Farmers Cooperative, supra,* at 249–250;

*Kane v. American National Bank and Trust Company,* 21 Ill.App.3d 1046, 316 N.E.2d 177 [1974].[1]

The second factor apparently relied on by the trial court in reaching its conclusion that PNB was not a payor bank is set forth in Conclusions of Law 8 and 9, which state as follows:

"8. The Plaintiff contends that the draft is drawn on PNB because it has the account number of Perdue & McCarthy Cattle Co. on the draft. All the evidence shows that the draft was drawn by Bernice Stephenson, an employee of T R Cattle Co. She had no authority to sign checks withdrawing funds from this account. This, together with the testimony presented, makes it clear that the Plaintiff never thought the draft was any obligation of the Defendant. It is also clear that Perdue & McCarthy Cattle Co. and PNB were not co-drawees.

9. PNB is not a 'payor' bank. The Uniform Commercial Code defines a payor bank as 'a bank by which an item is payable as drawn or accepted.' (12A O.S.1971 Sec. 4–105(2)). The item in this case could not be paid as drawn because it had no authorized signature and was not accepted. (12A O.S.1971 Sec. 3–410(1))."

These conclusions suggest an unspoken or implied finding by the trial court that the designation of drawee on the draft in question was ambiguous, and that it deemed itself at liberty to consider evidence extrinsic to the draft in determining the relationship of the parties. It is our view, based on such cases as *Pecos County, supra,* and *New Ulm, supra,* which involved drawee designations indistinguishable from the one involved here, and which held as a matter of law that such designations create co-drawees, that the draft here involved was not ambiguous.

---

1. The trial court apparently concluded that PNB followed the instructions in the letter from USB and, under the authority of 12A O.S.1981 § 4–203, could not be held liable for so doing. However, § 4–203 applies only to "collecting banks". A "collecting bank" is defined under

12A O.S.1981 § 4–105(d) as any bank handling an item for collection except the payor bank. See *Engine Parts v. Citizens Bank of Clovis,* 582 P.2d 809, 813 [N.M.1978]. Since we hold PNB was a co-drawee, and thus a payor bank, § 4–203 is inapplicable.

However, even if it be assumed that an ambiguity existed, and resort to extrinsic evidence were appropriate, we find nothing in this record to support a conclusion that PNB was not a co-drawee and therefore not a payor bank. This is particularly so when the record is viewed in the context of the paramount rule of construction elaborated in *Engine Parts,* as discussed *supra,* as well as the requirement of 12A O.S.1981 §§ 3–120 and 3–121, that there must be an express statement on the face of the draft indicating it is to be paid *"at"* or *"through"* a bank, before that bank is to be treated as a mere conduit and not a payor.

 The trial court determined in Conclusion No. 8 that the draft was drawn by an employee of TRC who did not have authority to write checks on P & M's account with PNB, and that this fact, "together with the testimony presented", made it clear TRC "never thought the draft was any obligation of the Defendant". We cannot find any support in the record for this conclusion.

All the evidence indicates that Ms. Stephenson in fact had authority to write the draft in question. She testified that (a) she had written checks on P & M's account with PNB on numerous occasions in the past; (b) that she had used up a supply of printed P & M counter checks which had been furnished her for that purpose (for this reason she had to use the envelope draft form); and (c) that she drew the draft in question as she had others on the account of P & M with PNB, "intending to draw it as [she] had the checks".

 The uncontradicted evidence further reflects that P & M never objected to the authority of Ms. Stephenson to draw the draft. To the contrary, all of the testimony in the record suggests that when the draft was received by PNB on February 29, 1980 and the PNB cashier telephoned a principal of P & M, their only concern was with deposit of sufficient funds by P & M to cover the draft by the following Monday, which P & M's principal indicated would be done. There is no evidence that either the PNB cashier or the P & M principal raised any question or objection concerning Ms. Stephenson's authority to prepare and sign the draft. Indeed, the PNB cashier testified (a) that PNB had processed hundreds of drafts drawn on P & M's account; (b) that his routine procedure was to call one of the principals of P & M for instructions whether to pay the draft; (c) that this was done because the person signing the drafts usually "was not an authorized signer on the account"; and (d) that this is "exactly what [he] did" in connection with the draft in question signed by Ms. Stephenson. In sum, while there may not have been a written resolution on file with PNB authorizing Ms. Stephenson to draw on P & M's account, nevertheless her signature was not "unauthorized". The terms of 12A O.S.1981 § 1–201(43) define an unauthorized signature only as one without "actual, implied or apparent authority". On this record there can be no question that she had actual authority and that, moreover, her drawing of the draft was ratified or acquiesced in by P & M when its representative in the February 29 phone conversation with PNB's cashier did not object to Ms. Stephenson's authority to sign, but instead indicated that sufficient funds would be deposited on March 3 to cover it.[2]

---

**2.** The trial court's preoccupation with the question of Ms. Stephenson's authority also led the court astray in Conclusion No. 9, where it held that PNB was not a payor bank because the draft "had no authorized signature and was not accepted", and that therefore the draft could not be paid as drawn. As noted above, this conclusion factually fails because the signature of Ms. Stephenson was authorized. But even if it had not been, PNB would not thereby be precluded from being a payor bank. To so hold would engraft upon the definition of payor bank in 12A O.S.1981 § 4–105(b) a requirement that a payor bank is one on which an item is payable as drawn or accepted, but only if the item is *properly* payable or accepted. There is no such requirement. Indeed, such a requirement would contravene 12A O.S.1981 § 4–302(a), which provides that a payor bank becomes accountable for a demand item held beyond its midnight deadline *whether the item is properly payable or not.*

The designation of drawee on the draft indicates that PNB was, at minimum, intended to be a co-drawee. There is a complete absence of any limiting language on the draft indicating it was to be paid *"through"* or *"at"* PNB. The actions and conversations of the involved representatives of the parties between February 29 and March 3, as testified to on this record, uniformly concerned themselves with whether P & M would deposit sufficient funds with PNB by March 3 to cover the draft. This is wholly consistent with treatment of PNB as a co-drawee and as a payor bank subject to a March 3 midnight deadline. Except for the authority issue, and the statement in USB's "collection letter" that the draft was submitted for collection, we have found nothing in the record extrinsic to the draft (nor has PNB referred us to anything [3]), which could arguably tend to show that PNB was not intended to be a co-drawee. But as already stated, Ms. Stephenson unquestionably had authority—there is no competent evidence to the contrary. And under *Engine Parts, supra,* the statements in USB's "collection letter" are irrelevant. We conclude that PNB was a co-drawee and therefore a payor bank.[4]

■ The draft here does not state a specific time for payment. It thus constitutes a demand item under 12A O.S.1981 § 3–

108. Therefore, PNB, as a payor bank, became "accountable" for the draft under 12A O.S.1981 § 4–302(a) once it failed to return or send notice of dishonor by midnight, March 3, 1980. "Accountable" has been uniformly construed to mean strict liability for the full amount of the draft, with no requirement that there be proof of actual damage. See *Pecos County, Engine Parts* and *Farmers Cooperative,* all *supra; Rock Island Auction Sales v. Empire Packing Co.,* 32 Ill.2d 269, 204 N.E.2d 721 [1965]; *Bank Leumi Trust Company of New York v. Bank of Mid-Jersey,* 499 F.Supp. 1022 [D.N.J.1980]; *Northwest National Insurance v. Midland National Bank,* 96 Wis.2d 155, 292 N.W.2d 591 [1980]. See also *Goodman v. Norman Bank of Commerce,* Okl., 565 P.2d 372 [1977], citing in footnote 2, both *Farmers Cooperative* and *Rock Island Auction Sales,* both *supra.* Thus, PNB became liable on March 4. The amount of liability was unquestionably liquidated in the face amount of the draft as of that date.

Three further arguments by PNB remain to be considered. The first is that the draft in question was a *documentary* draft, which is excluded from operation of the midnight deadline rule of 12A O.S.1981 § 4–302(a). " 'Documentary draft' means any negotiable or nonnegotiable draft *with*

---

**3.** PNB rested at the close of TRC's case without offering any witnesses.

**4.** In *Wilhelm Foods, Inc. v. National Bank of North America,* 382 F.Supp. 605 [S.D.N.Y.1974], which was not cited or relied upon in the briefs, the court relied on the content of a transmittal letter, together with lack of drawer authority, to resolve an ambiguity as to construction of a draft in favor of the subject bank and held that the bank was a collecting and not a payor bank. *Wilhelm, supra,* is distinguishable. In our case, all the evidence is that there was authority. Further, as discussed *supra,* the recent cases such as *Engine Parts, supra* note 1, and *Kane v. American National Bank and Trust Company,* 21 Ill.App.3d 1046, 316 N.E.2d 177 [1974], establish that the intent of a depositary bank such as USB, when transmitting an item is not relevant in determining the intent of the drawer when drafting the item; and that under 12A O.S.1981 §§ 3–120 and 3–121, words such as *"through"* or *"at"* or the equivalent must be used on the face of the draft to constitute the bank as a collecting

bank and not a payor bank. Lastly, as noted in *Western Air & Refrigeration, Inc. v. Metro Bank of Dallas,* 599 F.2d 83, 89 [5th Cir.1979]:

"Both *Engine Parts* and *Farmers Cooperative* arose from the transmittal of demand items through normal banking channels. In both cases the forwarding bank mistakenly added in its transmittal letter that the item was being forwarded for collection even though it was being sent to the payor bank. *In both cases, in addition to requesting collection, the transmittal letter made clear that the forwarding bank was demanding payment.* When a demand item arrives at a payor bank there is a presentment *even if there is a mistaken request for collection when it is clear that a demand for payment is made."* [emphasis ours]

In our case, the USB "collection letter" made clear that payment was being demanded. It stated the enclosed draft was drawn "on" PNB. Thus, PNB was unquestionably a payor-drawee.

*accompanying documents,* securities or other papers to be delivered against honor of the draft." [emphasis ours] 12A O.S. 1981 § 4–104(1)(f).

■ The trial court concluded as a matter of law that the draft in issue was a documentary draft, notwithstanding that it was *not* accompanied by any documents. The court reasoned in Conclusion No. 11(a) that the USB "collection letter" stated there were "papers included"; (b) that although it could be easily ascertained by looking at the draft envelope that there were no documents included, PNB was not required to look; (c) that the envelope was sealed; and (d) PNB was not entitled to open it.

■ We disagree with the trial court. Section 4–104(1)(f) expressly specifies that a documentary draft is one accompanied by documents. Clearly there was none here, and, as the trial court found, this was easily ascertainable by looking at the draft. The trial court's conclusion that PNB had no right or duty to open the draft envelope and inspect for documents was clearly premised on the more fundamental conclusion that PNB was only a collecting bank and not a co-drawee and payor bank. But, as we have held, PNB was not a mere collecting bank. It was instead a co-drawee and payor bank. If, despite the plain language of the draft, PNB chose to focus upon the language of the "collection letter" and treat itself as a collecting bank,

it did so at its peril. As stated in *Engine Parts, supra* at 814,

> "The mere forwarding of an item to the bank upon which it was drawn accompanied by a letter stating the item was enclosed for 'collection' and the treatment of the item by the drawee bank as a 'collection' item does not establish that the bank upon which the item was drawn is a 'collecting' bank. *Farmers Coop. Livestock Mkt., supra.*" [5]

The second remaining argument by PNB is based on estoppel. In this connection, the trial court held in Conclusion No. 13 that

> "the action of the Plaintiff's agent, Jerry Hill [TRC's manager], in directing PNB to hold the draft until March 3rd, 1980, after being told that the draft could not be paid on February 29th, 1980, estoppes [sic] the Plaintiff from bringing action because of a failure to timely return the draft."

Again, we find this legal conclusion to be incorrect. As we have held, PNB's midnight deadline was Monday, March 3. It was legally entitled to hold the draft in question until midnight of March 3, without incurring any liability, irrespective of what TRC may have requested. In agreeing to TRC's request to hold the item until Monday to see if P & M covered it by then with a deposit of sufficient funds, PNB in no way was prejudiced, nor did it in any way change its position to its detriment. Of critical importance here is the testimony of

---

5. TRC urges us to decide hypothetically PNB's payment obligations by assuming *arguendo* that the draft was a documentary draft. It cites *Union Bank of Benton, Arkansas v. First National Bank in Mt. Pleasant, Texas,* 621 F.2d 790 [5th Cir.1980], for the proposition that a documentary draft in the hands of a payor bank, though not subject to the midnight deadline of § 4–302(a), is nevertheless subject to § 4–302(b), with a comparable result. TRC stresses that under *Union Bank, supra,* and particularly the discussion at 794–795, dishonor of a documentary draft by a payor bank is not, as PNB argues, governed by 12A O.S.1981 §§ 4–501 through 4–504, but rather by § 4–302(b).

*Union Bank, supra,* has been seriously criticized. See Clark, The Law of Bank Deposits, Collections and Credit Cards, ¶ 7.9, at 7–19 to 7–27

[1981]. We decline to enter this hypothetical fray. The absence of any document accompanying the draft here in question concludes the issue whether this draft might be a documentary draft. Any analysis beginning with the premise that a draft unaccompanied by any documents might nevertheless be a documentary draft (excepting situations such as presented in *Marfa National Bank v. Powell,* 512 S.W.2d 356 [Tex.Civ.App.1974], where the draft and the "accompanying documents" were one and the same instrument) involves a fundamental contradiction in terms. If it is possible for such a situation to arise, it clearly has not arisen here. Judicial restraint compels us to refrain from speculating on how to deal with it should it ever arise.

both PNB's cashier and TRC's manager. Both testified to the effect (a) that TRC's request was only that PNB hold the item until March 3; (b) that although they talked again on March 3, there was no further request by TRC that PNB hold the draft any longer; and (c) that there was, in short, no other discussion on the subject of further retention of the draft. There is no conflict in the evidence as to the foregoing, and PNB therefore held the draft past midnight of March 3 at its peril.

■■■ There is some suggestion in the briefs that PNB gave oral notice of dishonor on March 3 when its cashier advised TRC's manager that sufficient funds had not been deposited to cover the draft, and that this notice absolved PNB from further responsibility under 12A O.S. 1981 § 4–302. This suggestion may be summarily rejected. The law is clear that if an item is being considered for dishonor, is available for return and is not being held for protest, the item itself must be returned. See *Colorado National Bank v. First National Bank*, 459 F.Supp. 1366 [W.D.Mich.1978]; *Blake v. Woodford Bank and Trust Co.*, 555 S.W.2d 589 [Ky.App.1977]; and *Northwest National, supra*. Further even if the draft were unavailable or were being held for protest, neither of which is claimed by PNB, the law is also well established that oral notice of dishonor is inadequate under §§ 4–301 and 4–302, and only written notice will suffice. See *Valley Bank and Trust Company v. First Security Bank of Utah, N.A.*, 538 P.2d 298 [Utah 1975]; *Available Iron and Metal Co. v. First National Bank of Blue Island*, 56 Ill.App.3d 516, 13 Ill.Dec. 940, 371 N.E.2d 1032 [1977]; accord, *Security Bank and Trust Co. v. Federal National Bank and Trust Co.*, Okl. App., 554 P.2d 119 [1976].

The third and final remaining argument of PNB relates to the second presentment of the draft, which occurred March 20, 1980. PNB did not return the item following this second presentment until April 17, 1980, and only then in response to a "tracer" from USB. As previously outlined herein, PNB's lawyer wrote to USB's lawyer on March 21, stating it would be his advice to PNB to deny the demand for payment contained in the letter from USB's attorney, which letter had accompanied the draft when presented by USB the second time. But the draft itself was kept by PNB and not returned until April 17.

The trial court made no conclusion specifically addressing the issue of whether PNB breached a midnight deadline following the second presentment by failing timely to return the item before midnight of March 21. Of course, under our reasoning PNB was a payor bank and obligated to act on the item before its midnight deadline in the absence of some authority to the contrary. And, as we have previously noted, where the draft was available for return, only that method of dishonor may be used. The letter from PNB's attorneys would not suffice.

PNB contends that where a draft is re-presented there is no need to give additional notice of dishonor upon the second presentment, citing as authority the Court of Appeals' opinion, *Goodman v. Norman Bank of Commerce*, Okl.App., 551 P.2d 661 [1976]. Although TRC admits that the *Goodman decision would decide the issue in PNB's favor*, it argues that the opinion *should not be followed*.

■■■ In *Goodman*—relying on *Leaderbrand v. Central State Bank of Wichita*, 202 Kan. 450, 450 P.2d 1 [1969]—the Court of Appeals held that once a check has been timely dishonored because of insufficient funds in the account on which it is drawn, a later presentment for payment while the account remains insufficient does not require an additional notice of dishonor by the payor bank. The terms of 12A O.S.1981 § 3–511(4)—which direct that "[w]here a draft has been dishonored by nonacceptance a later presentment for payment and any notice of dishonor and protest for nonpayment are excused unless in

the meantime the instrument has been accepted"—were applied in *Goodman* to *demand* items as well as to *time* items.[6] The majority position is contrary to this and applies 12A O.S.1981 § 4–302[7] strictly when demand drafts are involved, whether it is the first presentment or re-presentment.[8]

We believe that the majority view presents a better-reasoned reading of the UCC, as well as a far more feasible view under which the bulk processing national bank system can operate. The Court of Appeals' decision in *Goodman, supra,* is therefore *disapproved and overruled.*[9] Accordingly, we hold that PNB breached the requirements of § 4–302 by failing to

return the draft by midnight, March 21, 1980, following its second presentment the preceding day, and thereby became accountable for the item.

Certiorari is granted; the Court of Appeals' opinion is revised and the trial court's judgment is reversed, with directions to render judgment for TRC in the amount of $150,000, plus interest and costs.

The Supreme Court gratefully acknowledges the contribution of Messrs. William C. Anderson, James L. Kincaid and Donald Church, all of the Tulsa County Bar, who sat in consideration of this cause as judges of the Court of Appeals, Temporary Division 216. Today's pronouncement is but a revision of that division's opinion. Au-

---

6. *Leaderbrand v. Central State Bank of Wichita,* 202 Kan. 450, 450 P.2d 1 [1969], and *Goodman v. Norman Bank of Commerce,* Okl.App., 551 P.2d 661 [1976], have been criticized by courts and commentators alike. See *Wiley v. Peoples Bank and Trust Company,* 438 F.2d 513 [5th Cir.1971]; *Bank Leumi Trust Company of New York v. Bank of Mid-Jersey,* 499 F.Supp. 1022 [D.N.J.1980] (by implication); *Sun River Cattle Co., Inc. v. Miners Bank of Montana, N.A.,* 164 Mont. 237, 521 P.2d 679 [1974]; *Blake v. Woodford Bank and Trust Co.,* 555 S.W.2d 589 [Ky. App.1977]; *David Graubart, Inc. v. Bank Leumi Trust Company of New York,* 48 N.Y.2d 554, 423 N.Y.S.2d 899, 399 N.E.2d 930 [N.Y.App.1979]; *Prestige Motors, Inc. v. Carteret Bank and Trust Co.,* 183 N.J.Super. 525, 444 A.2d 627 [Super.Ct. 1982], aff'd., 188 N.J.Super. 610, 458 A.2d 140 [App.Div.1983]; Clark, The Law of Bank Deposits, Collections and Credit Cards [1981], pp. 3–23 and 3–24; Note, Uniform Commercial Code—Nonapplicability of Payor Bank's "Midnight Deadline" to Re-presented Checks, 18 Kan.L. Rev. 679 [1970].

Those cases which have rejected the *Leaderbrand* and *Goodman,* both *supra,* rationale have said that it is erroneous to rely on § 3–511(4) since "acceptance" relates to time items, not demand items such as the sight draft involved here. Thus, § 3–511(4) is said to make sense in the context of a time item, since if not accepted when presented for acceptance, it is a useless act to go forward with presentment for payment. But it does not make sense in the context of a demand draft since presentment of such items for payment a second or even third time frequently leads to ultimate payment. See Clark, The Law of Bank Deposits, Collections and Credit Cards, *supra,* and Note, Uniform Commercial Code—Nonapplicability of Payor Bank's "Midnight Deadline" to Re-presented Checks, *supra.*

7. 12A O.S.1981 § 4–302 provides:

"In the absence of a valid defense such as breach of a presentment warranty (subsection (1) of Section 4–207), settlement effected or the like, if an item is presented on and received by a payor bank the bank is accountable for the amount of

(a) a demand item other than a documentary draft whether properly payable or not if the bank, in any case where it is not also the depositary bank, retains the item beyond midnight of the banking day of receipt without settling for it or, regardless of whether it is also the depositary bank, does not pay or return the item or send notice of dishonor until after its midnight deadline; or

(b) any other properly payable item unless within the time allowed for acceptance or payment of that item the bank either accepts or pays the item or returns it and accompanying documents."

8. See *Prestige Motors v. Carteret Bank & Trust Corp., supra* note 6; *David Graubart, Inc. v. Bank Leumi Trust Company of New York, supra* note 6; *Blake v. Woodford Bank and Trust Co., supra* note 6; *Wiley v. Peoples Bank and Trust Company, supra* note 6; Note, Uniform Commercial Code—Nonapplicability of Payor Bank's "Midnight Deadline" to Re-presented Checks, *supra* note 6.

9. Today's overruling of *Goodman, supra* note 6, does not warrant a prospective application. *Goodman,* an opinion by the Court of Appeals, had *no* precedential value. Cf. *Thompson v. Presbyterian Hospital, Inc.,* Okl., 652 P.2d 260, 268–269 [1982] and *Snethen v. Okl. U. of Farmers Ed. & Co-op. U.,* Okl., 664 P.2d 377, 382 [1982].

thored by Mr. Anderson, it was concurred in by the other panel members.

All Justices concur.